**CHRISTOPHER VILLAGE, LP,**
**and Wilshire Investments,**
**Corp., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 99–775C.

United States Court of Federal Claims.

Oct. 26, 2001.

E. Grey Lewis, Washington, DC, for plaintiff. Ernest C. Baynard, III, of counsel.

Steven J. Gillingham, Washington, DC, with whom were Robert D. McCallum, Jr., Assistant Attorney General and Director David M. Cohen, for defendant. Nancy Christopher and Geoffrey L. Patton, U.S. Department of Housing Urban Development, of counsel.

## ORDER DENYING CLASS CERTIFICATION

FIRESTONE, Judge.

This action is brought by plaintiffs Christopher Village, Limited Partnership ("Christopher Village") and Wilshire Investments Corporation, the general partner (hereinafter referred to jointly as plaintiffs). The plaintiffs are seeking damages in connection with the government's actions in foreclosing upon plaintiffs' low-income housing apartment building, called Mockingbird Run Apartments, in Bryan, Texas. The complaint alleges that the actions taken by the United States Department of Housing and Urban Development ("HUD") in this foreclosure constitute a breach of plaintiffs' contracts with HUD. Plaintiffs' current motion, which the government opposes, is to certify a class

pursuant to Rule 23 of the Rules of the United States Court of Federal Claims ("RCFC 23"). The plaintiffs' putative class is made up of all allegedly similarly-situated low-income housing owners. As discussed below, the court finds that plaintiffs do not meet the criteria for class certification and therefore denies plaintiffs' motion for class certification under RCFC 23.

**BACKGROUND FACTS**

The facts in this case are best understood after a brief summary of the statutory and regulatory backdrop. For more than twenty years, Christopher Village owned the Mockingbird Run Apartments, a low-income housing complex with mortgages guaranteed by HUD under the National Housing Act of 1934, 12 U.S.C. § 1701 *et seq.* (2001). Under § 221(d)(3) of this Act ("Section 221"), HUD is authorized to insure loans made by private developers and others for the purpose of building and maintaining multifamily housing facilities for low and moderate income tenants. *See id.* § 1715(d)(3). The owners of Section 221 properties are allowed to sign non-recourse notes and are entitled to certain tax benefits, including accelerated depreciation. *See* 26 U.S.C. § 168(b)(4) (1998 & Supp.2001). In return for these benefits, owners must enter into a "Regulatory Agreement" with HUD. These Regulatory Agreements give HUD extensive authority over the operation and maintenance of the subject properties. Among the obligations established under the Regulatory Agreement, is the requirement that owners maintain the project in good condition. Section 7 of the Regulatory Agreement provides that owners must "maintain the mortgaged premises, accommodation, and the grounds and equipment appurtenant thereto, in good repair and condition."

In addition to these Regulatory Agreements, HUD also has statutory authority to enter into Housing Assistance Payment ("HAP") contracts pursuant to section 8 of the National Housing Act of 1937, 42 U.S.C. § 1437 ("Section 8"). Section 8 allows HUD to provide rental assistance to residents of non-government owned multi-family housing projects. 42 U.S.C. § 1437f. Under Section 8, HUD provides housing assistance pay-

ments directly to the owner. Many of the provisions of these HAP contracts are mandated by statute and regulation, including the requirement that owners maintain the project in good repair: section 14a of the HAP contract requires the owner to agree "to maintain and operate the contract units and related facilities so as to provide decent, safe and sanitary housing as defined by HUD." *See* 24 C.F.R. § 886.123(a) (1995).

The Regulatory Agreements and HAP contracts also address HUD's obligations with regard to setting rents for the subject properties. Pursuant to the Regulatory Agreements, HUD must approve project rents. Once rents are set, HUD must also approve any rent increase. Among the issues HUD must consider in evaluating a proposed rent increase are: "the project's operating costs and debt service (as calculated by HUD), and the owner's return on investment, with adjustments for vacancies, the project's non-rental income, and other factors HUD deems to be appropriate." 24 C.F.R. § 886.112(b). With respect to properly-supported requests for rent increases, pursuant to the Regulatory Agreement, HUD is required to: "Approve [those increases] that are necessary to compensate for any net increase occurring since the last approved rental schedule, in taxes ... and operating and maintenance expenses over which Owners have no effective control, or Deny the increase stating the reasons therefor." Regulatory Agreement § 4(g).

The present case arises out of the Regulatory Agreement and HAP contracts entered into between HUD and Christopher Village. In 1995, HUD decided to take action against Christopher Village based on HUD's conclusion that the Mockingbird Run Apartments had become severely run down. By 1995, HUD estimated that the cost of necessary maintenance repairs at the Mockingbird Run Apartments exceeded $1 million. As a consequence, HUD placed the project on its list of the nation's most troubled low income housing properties. This consequently subjected the Mockingbird Run Apartments and its managers to certain enforcement actions prescribed by a HUD enforcement program aimed at identifying and improving the phys-

ical and financial conditions of HUD's troubled subsidized properties.[1]

Under the HUD enforcement program, HUD assembled "Special Workout Assistance Teams" or "SWAT" teams to identify and correct maintenance problems at the subject properties.[2] Nicolas R. Retsinas, Assistant Secretary for Housing during the mid–1990's, explained the role of the SWAT teams in testimony before the United States House of Representatives, Committee on Government Operations Subcommittee on Employment, Housing and Aviation, as follows: "The SWAT approach provides a concentrated focus of skills and enforcement to prevent the failure of projects ... and to mitigate losses to the government." Addendum to Testimony of Nicolas P. Retsinas, Oct. 6, 1994. According to Vyllorya A. Evans, the Director of HUD's SWAT program from 1995 to 1998, over the life of the SWAT program, fifty HUD managers reviewed and evaluated the maintenance status of approximately 400 of HUD's 30,000 low-income housing projects. Ms. Evans explains in her affidavit that the projects identified for SWAT attention "were properties which failed to be maintained in good repair, but could also include projects with financial deficiencies, high vacancies, management deficiencies and diversions of project income."[3]

The actions taken by the SWAT team that evaluated the Mockingbird Run Apartments have already been the subject of litigation between plaintiffs and HUD. *See Christopher Village, LP v. Retsinas,* 190 F.3d 310 (5th Cir.1999). The key facts in that litigation are set forth in the Fifth Circuit's decision and may be summarized as follows. Following an initial inspection of the property in April 1995, HUD informed plaintiffs that their failure to refurbish the property could result in their loss of Section 8 rent subsidies and could lead to a default under their Regulatory Agreement. HUD took the position that under the Section 8 contract and Regulatory Agreement, Christopher Village had an absolute or unconditional obligation to maintain the project. In June 1995, plaintiffs asked HUD for a rent increase in order to meet HUD's demands for refurbishing the project. Christopher Village also submitted a proposed plan to address the problems at Mockingbird Run.[4] Without acting on the rent increase request, HUD sent a letter to plaintiffs on August 25, 1995, reiterating its contention that Christopher Village had a contractual obligation to maintain the premises and demanding that plaintiffs place $2 million in escrow to pay for the necessary repairs. On September 6, 1995, HUD sent a second

1. Plaintiffs have provided the court with certain background information regarding HUD's increased focus on enforcement as a means of placing responsibility for maintenance on the shoulders of the owners, including the transcript of an American Bar Association ("ABA") Workshop on HUD Enforcement held on May 29, 1997. At the workshop, various HUD officials explained their intention to strictly enforce the maintenance requirements set forth in HUD's Regulatory Agreements and Section 8 contracts.

2. In 1998 HUD established a Departmental Enforcement Center which assumed responsibility for bringing owners into compliance with their HUD agreements. The SWAT teams were part of this enforcement program. *See* Affidavit of Vyllorya A. Evans, Deputy Director of the Office of Housing Assistance and Grant Administration of HUD, at 2.

3. There were apparently many reasons that HUD-subsidized properties fell into disrepair, including significant changes in the demographics of assisted housing. Assistant Secretary Retsinas testified before Congress: "We must also change the demographics of assisted housing. In the

1980's, when projects ran into financial trouble, HUD provided additional Section 8 assistance. What seemed like a good way to prevent defaults had an unintended side effect.... The higher-income residents, the working poor, left these projects, and the concentration of tenants on public assistance increased.... As with public housing, the good intentions of the past have resulted in concentrating the least able, the poorest, and the disheartened." Retsinas, Oct. 6, 1994 testimony.

Sherry Pugh, a manager of the Mockingbird Run Apartments who worked for Bynam Properties, explained some of the challenges the project managers faced in an April 11, 1995 memorandum following a HUD inspection. She explained that having 100 percent Section 8 tenants at Mockingbird Run Apartments took a physical toll on the property.

4. Christopher Village offered to make a $500,000 capital contribution to resolve the repair issues, but the offer was made as part of an overall package that included a substantial rent increase and additional contributions from HUD. HUD rejected the offer.

letter stating that it would not act on plaintiffs' requested rent increase until plaintiffs agreed to comply with the August 25 letter. When plaintiffs failed to place the $2 million cash infusion in escrow, on September 14 HUD notified plaintiffs that they were in default of their Regulatory Agreement. As a result, the federally-insured mortgage was assigned to HUD, which took possession of the property in foreclosure.

The plaintiffs in the present action filed their original suit against HUD officials in the United States District Court for the Southern District of Texas following HUD's decision to foreclose on the property. In that lawsuit, plaintiffs sought to set aside HUD's actions on the grounds that HUD's failure to consider plaintiffs' rent increase request was unlawful, the demand for $2 million was illegal, and that without sufficient rental revenue it was not possible for plaintiffs to maintain the property. Settlement efforts failed when HUD refused Christopher Village's offer to fund the repairs through a rent increase. Subsequently, the district court denied plaintiffs' requested relief and granted summary judgment for HUD. The district court held that under Christopher Village's agreements with HUD, Christopher Village had an absolute obligation to maintain the property, without regard to HUD's approval of any rent increases. Plaintiffs' request for a stay pending appeal was denied by both the district court and court of appeals, and HUD slated the property for sale. HUD subsequently sold Mockingbird Run Apartments to the City of Bryan for $10.00.

On appeal, the Fifth Circuit found that several of plaintiffs' claims were moot, but concluded that Christopher Village's claim for declaratory relief remained. Specifically, the Fifth Circuit noted that a "declaration that HUD violated its regulations and contracts grants [plaintiffs] adequate relief because, even without regaining title to the property, [plaintiffs] could use the declaration as a predicate for a damages action against HUD in the Court of Federal Claims." *Christopher Village*, 190 F.3d at 315. After reviewing HUD's regulatory authority, the court concluded that although HUD's authority to grant or deny a rent increase is committed to HUD's unreviewable discretion, HUD could not lawfully refuse to "consider" a rent increase. The court held that under HUD's housing program, "all of the expenses of operating and maintaining a low income housing project must be paid out of rental revenue, which in turn are subsidized by HUD. The regulatory scheme does not contemplate that property owners must bear the risk of maintaining properties based on insufficient rental revenues." The court recognized that HUD could "refuse to provide financial assistance to an owner that has misappropriated funds, mismanaged the property, taken a profit instead of maintaining the property or has been negligent in its management in some other regard." The court then concluded that, "When those elements are absent, however, the statutes provide that HUD must ensure that the owner receives rents sufficient to meet at least the operating and maintenance expenses of the property."

Based on its review of the specific facts surrounding Christopher Village's ownership of the Mockingbird Run Apartments, the Fifth Circuit determined that plaintiffs had not been negligent and had not misused any rental income. Accordingly, the court concluded that "HUD acted arbitrarily and capriciously when it refused to abide by its legal obligation to consider a rental increase request from a non-negligent owner and instead demanded a $2 million cash infusion and then declared the property in default for those very reasons." *Id.* at 319.

On September 21, 1999, plaintiffs filed suit in this court claiming that they are entitled to damages based on the Fifth Circuit's ruling in their favor. They also claim that a class of similarly-situated property owners should be certified. After several rounds of briefing, plaintiffs contend in their final brief that the class they purport to represent includes all low-income property owners that: 1) entered into a Regulatory Agreement with HUD; 2) entered into at least one Housing Assistance Payment Contract, or "HAP" contract, with HUD and had tenants with subsidized rents under Section 8; 3) had properties in distressed condition because they did not receive sufficient funds from HUD to

support or encourage rehabilitation; 4) were subjected to HUD's enforcement of the Regulatory Agreement requirement that they "maintain the property in good repair and condition"; and as a consequence 5) were forced by HUD to either default or seek additional equity or debt financing without assurance that these investments would be recouped.[5]  Plaintiffs represent that they do not propose to include within the class any "owner that has misappropriated funds, mismanaged the property, taken a profit instead of maintaining the property or been negligent in its management in some other regard."

Defendant contends that plaintiffs' motion for class certification must be denied for various reasons, including those identified in the affidavit of Vyllorya A. Evans, who, as noted above, was once the director of HUD's SWAT program.  Evans' affidavit states that the most comprehensive list of SWAT properties is found on the October 22, 1996 SWAT list,[6] and that based on a review of that list there are approximately 200 properties allegedly meeting plaintiffs' criteria for class certification.  According to Evans, the SWAT list shows that forty-nine of the projects listed as having received a departmental sanction also received subsidies under Section 8. Similarly, 155 of the projects iden-

tified in the "Owner Compliance" category also received Section 8 subsidies.

Evans goes on to state, however, that the fact that a property was referred to SWAT or included in the "Departmental Sanctions" or "Owner Compliance" categories of the SWAT list "tells very little about the project."  More specifically, Evans explains that:

A project may be listed under Department Sanctions, for example because it was in poor physical repair, because it was chronically delinquent in its mortgage payments, because the owner was suspected of misusing project funds, because the owner had refused to obtain management for the project which was acceptable to HUD, or for a variety of other reasons.

With respect to the "Owner Compliance" category, Evans states that there could also be a variety of reasons for the listing.  "The owner may have financed repairs from its own resources, it may have obtained a rent increase or other financial assistance from HUD to pay for repairs, HUD-approved management may have been obtained, the mortgage delinquency could have been cured with HUD-approved secondary financing, or misspent project funds could have been returned."

In addition to the foregoing examples of potential differences among the projects list-

---

**5.**  Plaintiffs laid out these factors in their April 9, 2001 reply to defendant's response to their supplemental brief in support of their motion for class certification.  Plaintiffs contend that the putative class is delineated in an internal HUD document titled, "SWAT PORTFOLIO: ASSIGNED PROJECT LIST" and that each individual property owner whose project is listed as being within one of two enforcement categories on that list—either "Departmental Sanctions" or "Owner Compliance"—is a member of the putative class.

**6.**  In Vyllorya Evans' affidavit, she explains that HUD no longer maintains a SWAT Portfolio list, because it is no longer using the SWAT approach.  *See supra* note 2.  As such, the only comprehensive SWAT list that HUD was able to produce was dated October 22, 1996.  According to Evans, HUD followed its regular document retention procedures with regard to the documents relating to SWAT.

Plaintiffs seek sanctions against the government on the grounds that HUD failed to maintain all of its SWAT files after the program was ended

in 1998, despite HUD's alleged knowledge of plaintiffs' potential class action.  Whether or not to impose such sanctions for an alleged discovery violation is "a fact-specific inquiry."  *Ehrenhaus v. Reynolds*, 965 F.2d 916, 920 (10th Cir.1992).  A trial court's decision regarding such sanctions is accorded broad discretion.  *See National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976).  In the case at bar, plaintiffs make their claim despite the fact that they have not shown that HUD could have anticipated this litigation.  Moreover, plaintiffs have never sought any discovery from HUD in the three years that this case has been pending.  In such circumstances, the request for sanctions is DENIED.  *See Gates Rubber Co. v. Bando Chemical Industries, Ltd.*, 167 F.R.D. 90, 101–104 (D.Colo.1996) (listing various factors to be considered in such circumstances, including knowledge of pending litigation, bad faith, and degree of prejudice caused); *Kansas–Nebraska Natural Gas Co., Inc. v. Marathon Oil Co.*, 109 F.R.D. 12, 18 (D.Neb.1983) (declining to impose sanctions when records were destroyed by defendant "in the regular course of its business").

ed in the SWAT Portfolio and included in plaintiffs' putative class, the Evans affidavit also identifies several other factors that may make each project situation unique. Evans notes that other differences between SWAT-listed properties include: "a. owners that may not have properly sought rent increases; b. owner[s] [that] may not be entitled to rent increase sought . . .; g. owners [that] may have been formally found to be in contractual default prior to a rent increase request; . . . and k. owners [that] may have already litigated and released claims against HUD."

In their reply brief, plaintiffs do not specifically challenge any of Evans' factual contentions. Instead, plaintiffs argue that the SWAT list should have only included properties with non-negligent owners, because HUD always had enforcement authority against negligent owners and therefore did not need a special program to address those situations.[7] In addition, plaintiffs assert that any factual differences are irrelevant because they only purport to represent the non-negligent project owners that were forced to default or to pay for repairs based on HUD's application of its unlawful enforcement policy, a policy to hold owners unconditionally liable for the cost of maintenance under their Regulatory Agreements and Section 8 contracts.[8]

7. Christopher Village relies extensively on discussions that took place during the 1997 ABA Conference between HUD and private attorneys to allegedly demonstrate that HUD was applying its enforcement policy with equal force against negligent and non-negligent owners. *See supra* note 1.

8. Plaintiffs have also filed a motion for partial summary judgment seeking to establish the reach of the Fifth Circuit decision in this proceeding. Plaintiffs argue that under established principles of collateral estoppel, HUD may not re-litigate the lawfulness of its actions against Christopher Village in this court and that based on the Fifth Circuit's ruling, Christopher Village is entitled to damages. Christopher Village further argues that all the members of its putative class are also entitled to the benefits of the Fifth Circuit ruling based on collateral estoppel principles.

The government contends that Christopher Village has misread the scope of the Fifth Circuit's decision and that the Fifth Circuit did not address all of the issues relevant to a breach of

## DISCUSSION

The Court of Federal Claims provides for litigation via class action in RCFC 23. "Class actions provide courts with the opportunity to promote good litigation management by balancing among [sic] a variety of competing interests, including time, efficiency, cost, and the right of individual plaintiffs to file complaints to redress perceived wrongs, preventing a multiplicity of suits based on a common wrong to all." *Berkley v. United States,* 45 Fed.Cl. 224, 226 (1999) (citations omitted). Class actions provide an avenue to correct otherwise unremediable wrongs, either because the "individual claims involved are too small, or the claimants are too widely dispersed." *Id.* at 226. Although RCFC 23 provides for class certification, the rule offers little guidance for the court to follow in considering class certification. Rule 23 simply states that, "The court shall determine in each case whether a class action may be maintained and under what terms and conditions." To assist in deciding the appropriateness of a requested class certification, members of this court have turned to a decision of the United States Court of Claims, the predecessor court to the United States Court of Appeals for the Federal Circuit, which established an eight-prong test to be applied by the trial court in deciding whether to certify a class. *See Quinault Allottee*

contract case for damages in this court. Rather, the government contends, the Fifth Circuit resolved "only a narrow interpretative issue . . . whether Christopher Village had an unconditional obligation to maintain the premises, regardless of HUD's willingness to review rent increase requests. The court answered the issue in the negative, and *we do not intend to revive it . . . .*" Nonetheless, the government argues that the issue in this case is "whether Christopher Village breached its obligations and whether any such breaches were excused upon the basis of a corresponding Government breach." The government also argues that the Fifth Circuit decision may not be applied to members of Christopher Village's putative class.

Because the court is denying plaintiffs' motion to certify a class, plaintiffs' request for partial summary judgment regarding the application of the Fifth Circuit decision to members of the putative class is hereby **DENIED** as *moot.* As for the plaintiffs themselves, the court will reserve ruling on the merits of plaintiffs' summary judgment motion until after oral argument is heard on that motion.

*Ass'n v. United States,* 197 Ct.Cl. 134, 453 F.2d 1272 (1972).

■ Under the *Quinault* test, a plaintiff must demonstrate that: 1) the class is large but manageable; 2) there is a question of law common to the whole class; 3) the common question of law predominates over individual questions of fact; 4) plaintiff's claim is typical of those claimed by class members; 5) the government's action is generally applicable to the class; 6) the claims of the class members are too small to be pursued individually; 7) the plaintiff will adequately represent the class; and 8) individual actions would create the risk of varying adjudications. *See Quinault,* 197 Ct.Cl. at 140–41, 453 F.2d 1272. In applying the eight-prong *Quinault* test, this court must be mindful of the numerous cases that begin with the admonition that class action suits in the Court of Federal Claims are "generally disfavored." *Hannon v. United States,* 31 Fed.Cl. 98, 102 (1994); *Berkley,* 45 Fed.Cl. at 228 (listing numerous cases which cite the disfavored status of class actions in the Court of Federal Claims). Thus, in evaluating class action requests such as this one, courts must carefully consider the various *Quinault* factors. In addition, courts are required to make the factual and legal inquiries necessary to ensure that class certification is appropriate. *See Szabo v. Bridgeport Machines, Inc.,* 249 F.3d 672, 676 (7th Cir.2001) ("This would be plain enough if, for example, the plaintiff alleged the class had 10,000 members, making it too numerous to allow joinder ... while the defendant insisted that the class contained only 10 members. A judge would not and could not accept the plaintiff's assertion as conclusive; instead the judge would receive evidence (if only by affidavit) and resolve the disputes before deciding whether to certify the class.").

Applying the *Quinault* test to the present facts, Christopher Village argues that all eight prongs have been satisfied and that a class should therefore be certified. The court disagrees. Specifically, as discussed below, the court finds that plaintiffs fail to satisfy prongs three, four, six, and eight. Having failed to satisfy half of the *Quinault* factors, the court finds that class certification is not appropriate.[9]

## The third *Quinault* factor

■ It is well-recognized in this court that the third *Quinault* factor is among the most important. The third *Quinault* factor requires a finding that a common legal question predominates over separate factual issues affecting individual members of the putative class. Several cases have noted that:

> A showing of common factual issues should be weighed more heavily than a showing of common legal issues in granting certification.... Insofar as factual issues are truly common to large groups of potential plaintiffs, class certification may be useful in avoiding repetitive lawsuits and in spreading the burden of litigation. On the other hand, the Claims Court can resolve common legal issues relatively inexpensively by motion in a single case.

*Cooke v. United States,* 1 Cl.Ct. 695, 698 (1983). *See also Banner v. United States,* 38 Fed.Cl. 700, 703 (1997) ("Factual commonality is more determinative than legal commonality when considering class certification because factual issues are generally difficult and expensive to litigate, whereas legal issues may be resolved quickly and inexpensively through motions in a single case."); *Cutright v. United States,* 15 Cl.Ct. 576, 579 (1988) ("In granting class certification common factual issues should be weighed more heavily than common legal issues.").

The plaintiffs argue that they have satisfied this prong because HUD imposed the same policy of "absolute financial responsibility" for maintaining low-income multifamily housing on all of the project owners identified on the SWAT list, and therefore HUD breached its Regulatory Agreements and HAP contracts with all putative class members. The government counters that plaintiffs have failed to satisfy the third *Quinault* prong because even if HUD's enforcement policy is contrary to a statute, regulation, or contract, each class member must still prove

---

9. Because the court finds that plaintiffs have plainly failed to satisfy four of the *Quinault* factors, it is not necessary to evaluate the remaining factors. Even if the remaining four factors were resolved in plaintiffs' favor, it would not tip the balance in favor of class certification.

individually that it is entitled to damages. *See Busby v. United States,* 8 Cl.Ct. 596, 603 (1985) ("The plaintiffs, and the class they seek to represent, claim damages. Each plaintiff and members of the class they seek to represent would be required to prove specifically entitlement to the damages claimed."). In particular, the government argues that in order to establish a right to damages, each class member must still show that HUD failed to provide them with adequate rents or other payments to meet their maintenance obligations. Indeed, the government notes that since the linchpin of each case would be HUD's alleged failure to provide adequate contributions to maintain the low-income project, each case by necessity would require project-specific determinations about the reasonableness of HUD's actions with regard to each individual owner's alleged rent requests. In addition, the government argues, the court would also be required to evaluate the reasonableness of each owner's actions with respect to the rent it received.

The court agrees with the government. While plaintiffs argue that they do not purport to represent any class members who misappropriated rents or mismanaged their property, they fail to appreciate that HUD's policy of unconditional responsibility for project maintenance will only support a damage claim if the owner can demonstrate to the court that it managed its property responsibly and performed required maintenance using the rents it did receive.

Moreover, even if each individual class member could show that HUD illegally refused to provide it with adequate rents to cover expenses, each owner would still be subject to the government's proof that a prior breach of contract by the owner nonetheless excused that breach. For example, the Evans affidavit notes that some owners identified on the SWAT list may have been in default of their Regulatory Agreement or HAP contracts for failing to previously repair their properties after having received an earlier rent increase.

Finally, before any putative class member could receive a damage award, the court would require individualized proof of the ac-

tual damages incurred by every single low-income property owner. Plaintiffs' suggestion that damages could be easily quantified by determining whether HUD received a cash infusion or forced an owner into foreclosure is unsupported. This court would not be able to determine damages for any party without individual presentations of evidence regarding the amounts lost by those owners, minus the amounts they would otherwise have been required to pay in the absence of the alleged breach.

For all of these reasons, the court concludes that the substantial factual differences between plaintiffs and the putative class members with regard to both entitlement to and the amount of damages plainly overshadow any common legal issues that exist. The variety of unique circumstances surrounding each owner's relationship with HUD plainly counsels against class certification.

**The fourth *Quinault* factor**

Plaintiffs have also failed to demonstrate that their claims are typical of those claimed by potential class members, as required under the fourth *Quinault* factor. Plaintiffs' contention that their claims define the class is not correct. In contrast to the class members they seek to represent, the plaintiffs in this case have already litigated many of the relevant issues before the district court and Fifth Circuit. The plaintiffs in the instant action had the opportunity to present the unique factual circumstances of their contractual relationship with HUD, and the Fifth Circuit ruled in their favor and sent them to this court to seek damages. None of the putative class members that the plaintiffs are now seeking to represent have established the right to damages. Each putative class member has a different historical relationship with HUD, and a different set of circumstances that may or may not establish a contract breach.

For example, the present plaintiffs have a Fifth Circuit finding that the government had failed to prove that Christopher Village had either mismanaged the Mockingbird Run Apartments or received sufficient rent increases to pay for needed maintenance. Plaintiffs argue that principles of collateral estoppel bar the government from relitigat-

ing those findings in this court. While this may very well be true as to Christopher Village and Wilshire Investments Corporation, it is clearly not true as to any other hoped-for class members. Assuming arguendo that the Fifth Circuit considered the issues that will be examined by this court in adjudicating plaintiffs' damage claim (as noted *supra*, the court will rule on plaintiffs' summary judgment motion separately), none of the other purported class members have established similar facts. In such circumstances, these plaintiffs will not be required to litigate certain issues that other members of the putative class must litigate. Accordingly, plaintiffs are not typical of the class members they seek to represent. Plaintiffs fail to satisfy the fourth *Quinault* factor.

**The sixth *Quinault* factor**

■ Under the sixth *Quinault* factor, plaintiffs must demonstrate that the claim of each putative class member is too small to be pursued individually. "The relevant inquiry under this criterion is whether the class members would pursue the claim if the class was not certified." *Taylor v. United States,* 41 Fed.Cl. 440, 447 (1998) (citation omitted). Plaintiffs allege that they meet this criterion because they purport to represent the thousands of individual limited partners that own the low-income housing projects identified on the SWAT list. Plaintiffs assert that the damages for each partnership within the proposed class are likely to run between $500,000 and $2 million apiece, however, given the hundreds of individual limited partners, each individual limited partner will only likely recover between $5,000 and $10,000. Plaintiffs argue that this amount is not large enough to justify individual lawsuits by each limited partner.

Plaintiffs' argument that the amount owed to each individual limited partner is too small to justify separate actions is wholly unpersuasive. To begin with, the present action has been filed only in the name of the limited partnership and the general partner; it was not filed in the name of the alleged 500 individual limited partners with an interest in Christopher Village and Wilshire Investment Corporation. Certainly, the present plaintiffs have deemed it worthwhile to pursue

this claim against HUD, and there is no reason to believe that other low-income property partnerships will not reach the same conclusion and file suit for the benefit of their individual partners. This is particularly true where, as here, plaintiffs contend that each partnership is entitled to $500,000 to $2 million. These are sums that are certainly worth the cost of litigation. The suggestion that limited partners will not file individual suits in the absence of a certified class is of no moment. HUD entered into contracts with specific partnerships, and those partnerships have an incentive to pursue claims for several million dollars. Under these facts, the court finds that individual actions by the separate partnerships are likely to be maintained despite the denial of class certification. Thus, plaintiffs have failed to meet the sixth prong of the *Quinault* test.

**The eighth *Quinault* factor**

■ Finally, plaintiffs have failed to satisfy the eighth prong of the *Quinault* test. The eighth prong pertains to the risk of inconsistent adjudications. Here, there is virtually no risk of inconsistent adjudication because cases against the United States based on a breach of contract claim in the amounts asserted here may only be heard in the Court of Federal Claims and reviewed by the Federal Circuit. Moreover, in light of the individual factual issues which will govern the outcome of each case, the differences among adjudications likely will be based on differences in the factual circumstances of each case, and not on differing views of the legal questions presented. Contrary to plaintiffs' assertions, the court does not believe that this eighth factor is "irrelevant." There may be circumstances where potential class members are so similar (as in a partnership tax case or back pay case) that not treating the members of the class together in a single action could result in the potential for inconsistent rulings on recovery. In this case, however, the factual circumstances of each project owner's situation and the amount of damages are bound to be so unique that "consistency" does not weigh in favor of certification.

645

## CONCLUSION

For the foregoing reasons, the court finds that plaintiffs have not met the requirements for class certification as set forth in RCFC 23 and *Quinault*. Plaintiffs have not demonstrated that certification in this action will serve the interests of justice or is otherwise appropriate.[10] Therefore, the court **DENIES** plaintiffs' September 21, 1999 motion for class certification.

**IT IS SO ORDERED.**

10. The fact that class certification is not appropriate in this instance does not, however, foreclose the possibility that if other actions are later filed by other project owners, other case management techniques may be deemed appropriate. The court has, on other occasions, worked with parties to coordinate discovery or briefing on related issues found in separate cases, where the cases share common legal issues but the individual claims for damages are predicated on very different factual questions.