UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 98-20181

CHRISTOPHER VILLAGE, LIMITED PARTNERSHIP;
WILSHIRE INVESTMENTS CORPORATION,

Plaintiffs-Appellants,

v.

NICHOLAS P RETSINAS; ET AL,

Defendants,

NICHOLAS P RETSINAS; ALBERT CASON, Director Multifamily
Housing Management; THE HONORABLE ANDREW M CUOMO,
Secretary of Housing and Urban Development; HENRY CISNEROS,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Texas

September 15, 1999

Before JONES, SMITH, and EMILIO M. GARZA, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Appellants Christopher Village, Ltd. and Wilshire Investments (collectively "Village"), owned and managed a federally subsidized low income housing complex in Bryan, Texas. They filed this suit contending that the Department of Housing and Urban Development (HUD) caused Village to default on its obligation to maintain the property by denying necessary rent increases and illegally demanded a multimillion-dollar equity contribution from

Village.  As the suit progressed, HUD reacquired and sold the property at foreclosure, and the apartment complex has been torn down.  Nevertheless, as to the part of this case which is not moot, we hold that HUD's actions were arbitrary and capricious.  Village is entitled to a partial declaratory judgment in its favor.

**BACKGROUND**

**1.  HUD Regulatory Scheme**

The National Housing Act was enacted (and subsequently amended) to "assist private industry in providing housing for low and moderate income families and displaced families."  12 U.S.C.A. § 1715*l*(a) (West 1989).  To foster private investment, the Act authorizes HUD to insure private mortgage loans used to construct low income housing.  See 12 U.S.C.A. § 1715*l*(d)(3) (West 1989).  In addition, the Act and HUD regulations encourage private investment by allowing owners to borrow money at reduced interest rates, reducing a borrower's equity requirements, permitting owners to sign non-recourse notes, and, prior to the 1986 tax code changes, granting owners and investors generous tax benefits.  See generally, Kargman v. Sullivan, 552 F.2d 2, 4 (1st Cir. 1977).  By granting owners these benefits, Congress sought to reduce the financial risk associated with operating low income housing by "reducing the rentals necessary to service the landlord's debt obligation."  Hahn v. Gottlieb, 430 F.2d 1243, 1245 (1st Cir.

2

1970); see also Beck Park Apartments v. United States Dep't of Hous. and Urban Dev., 695 F.2d 366, 368 (9th Cir. 1982).

In exchange for these financial benefits, HUD requires low income property owners to enter into "Regulatory Agreements" that give HUD extensive regulatory authority over the operation and maintenance of the property. See 12 U.S.C.A. § 1715*l*(d)(3).[1] Under a standard Regulatory Agreement, an owner must dedicate the property for medium or low income tenants, must remain a sole asset entity (i.e., may not engage in any business other than owning and operating the property), may not take a profit distribution over six percent per year, must adequately maintain the property, and may not increase rents without approval from HUD. See Kargman, 552 F.2d at 4. If an owner violates the Regulatory Agreement, HUD may declare the property in default, accelerate the mortgage, and foreclose on the property.[2] HUD also sets the maximum allowable rent an owner can charge its tenants. In doing so, HUD is supposed to provide owners with sufficient funds to operate and maintain the property, service the debt, pay taxes, cover various reserve

---

[1]Section 221(d)(3) requires owners to be "regulated or supervised . . . by the Secretary under a regulatory agreement or otherwise, as to rents, charges, and methods of operation, in such form and in such manner as in the opinion of the Secretary will effectuate the purposes of this section."

[2]HUD may exercise these remedies only if it holds the note. If the lender still holds the note, HUD can notify the lender of the default and request that it accelerate the mortgage and foreclose, or request that the note be assigned to HUD so it can do so.

requirements, and provide the owner a reasonable return on investment. See, e.g., 12 U.S.C.A. § 1747c (West 1989).[3] If rental revenues fail to cover these costs, an owner can request a rental increase from HUD. See 24 C.F.R. § 245.325.

Since most tenants of low income housing are on welfare and cannot afford to pay the full contract rental price, Congress created the Section 8 housing program to subsidize their rent. See 42 U.S.C.A. § 1437f (West 1994). "Under the program, tenants make rental payments based on their income and ability to pay; [HUD] then makes 'assistance payments' to the private landlords in an amount calculated to make up the difference between the tenant's contribution and a 'contract rent' agreed upon by the landlord and HUD." Cisneros v. Alpine Ridge Group, 508 U.S. 10, 12, 113 S. Ct. 1898, 1900 (1993). Because the Section 8 program requires that a tenant pay a maximum of 30% of the gross rent, if HUD approves a rental increase, the majority of the increase is absorbed by HUD via the Section 8 subsidy. The subsidy is implemented through

---

[3]12 U.S.C.A. § 1747c states:

Prior to approving the initial or any subsequent rent schedule pursuant to this section, the Secretary shall find that such schedule affords reasonable assurance that the rents to be established thereunder are (1) not lower than necessary, together with all other income to be derived from or in connection with the project, to produce reasonably stable revenues sufficient to provide for the payment of the operating expenses, the minimum annual amortization charge, and the minimum annual return; and (2) not higher than necessary to meet the need for dwellings for families of moderate income.

4

Housing Assistance Payment ("HAP") contracts entered into between HUD and the property owners which extensively regulate an owner's management of the property. HAP contracts set the maximum allowable rent an owner may charge and the subsidy amount paid by HUD and require owners to maintain the property in a safe and sanitary condition.

## 2. Factual and Procedural History

The property at issue in this case, Mockingbird Run Apartments, was built in 1970 from the proceeds of a § 221(d)(3) insured loan and was therefore subject to a Regulatory Agreement. Because Mockingbird was receiving Section 8 subsidies, the property was also subject to a HAP contract. When Village purchased Mockingbird in 1983, it assumed the obligations and benefits of both agreements.

By 1995, Mockingbird's physical condition had substantially deteriorated and approximately $2 million was needed to restore the property. HUD warned Village that a failure to refurbish the property could result in abatement of Section 8 subsidies and constituted a default under the Regulatory Agreement. The parties began negotiating plans to repair Mockingbird, including the issue who would fund the needed repairs. Each of several plans proposed by Village stipulated that HUD would increase the contract rent and Village would incur a large loan to be repaid out of the property's future rental revenues. HUD,

5

however, rejected the proposals, insisting instead that Village pay all of the $2 million repairs without any assistance from HUD.

In June 1995, Village formally requested that HUD increase its contract rent since Mockingbird's rental revenues were inadequate to reimburse its operating costs and the necessary maintenance and repairs. Without approving or denying the request, however, HUD replied by letter dated August 25, 1995, demanding that Village place the $2 million needed to pay for the repairs in escrow within 60 days or face default. On September 6, HUD reiterated its demand, cautioning that, although Village's rent increase request was under review, "no action will be taken at this time due to the provisions in the HUD letter dated August 25, 1995." Finally, on September 14, HUD notified Village that, since Village had not complied with the August 25, 1995 demand for $2 million and because Village had "violated paragraph eight of the Regulatory Agreement by not maintaining the mortgaged premises in good repair and condition," HUD would "proceed without further notice to take whatever remedies are appropriate". HUD intended to accelerate the mortgage and foreclose on the property. Indeed, on December 1, 1995, HUD assumed control of the property as a mortgagee in possession.[4]

Village sued various HUD officers seeking a declaratory

_____

[4]On November 17, 1995, the original lender assigned the note and mortgage to HUD and collected the insurance proceeds. Thus, HUD had the same remedial rights as the original lender.

judgment, an injunction, and mandamus, arguing that HUD unlawfully refused to entertain its rent increase request, illegally demanded $2 million, and made it impossible for Village to maintain the property because of insufficient rental revenues. The district court, unmoved, ultimately denied all of Village's requested relief and granted summary judgment in favor of HUD. According to the court, HUD's rent increase decisions are unreviewable[5], and Village had an absolute obligation to maintain the property regardless whether it received sufficient rents to cover repair costs.

After obtaining the favorable summary judgment, HUD slated the property for foreclosure sale. Although Village moved the district court to stay the sale pending appeal, the district court, and subsequently this court, rejected the motion and allowed the sale to proceed. HUD, as the only bidder, bought the property at the auction and eventually "sold"[6] it to the City of Bryan Housing Authority, allegedly to be demolished and redeveloped as elderly and handicapped housing.[7]

---

[5]The court alternatively held that, even if reveiwable, Village failed to show that HUD's actions were arbitrary and capricious.

[6]The City of Bryan paid $10 for the property. That HUD was authorized to sell the property to the City of Bryan is not in dispute: "HUD may negotiate the sale of any project to an agency of the federal, State, or local government." 24 C.F.R. 290.13(a).

[7]At oral argument, HUD represented to this court that it owned the property and had spent several million dollars renovating it when, in fact, it had already transferred the property to the City of Bryan several months before.

**STANDARD OF REVIEW**

This court reviews a grant of summary judgement <u>de</u> <u>novo</u>, applying the same standards as the district court. Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>see</u> <u>also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-24, 106 S. Ct. 2548 (1986). All fact questions are reasonable inferences draw therefrom are viewed in the light most favorable to the non-moving party. <u>See</u> <u>Urbano v. Continental Airlines, Inc.</u>, 138 F.3d 204, 205 (5th Cir. 1998).

**DISCUSSION**

**I. Mootness**

Before considering the merits of this appeal, it is necessary to determine whether Mockingbird's foreclosure sale, purchase by HUD, and subsequent transfer to the City of Bryan mooted this appeal. "The mootness doctrine is grounded primarily and originally in the appellate court's inability to fashion relief." <u>Sullivan Cent. Plaza I, Ltd., v. BancBoston Real Estate Capital Corp. (In re Sullivan Cent. Plaza, I, Ltd.)</u>, 914 F.2d 731, 733-34 (5th Cir. 1990). Ordinarily, an appeal will be moot when the property underlying the dispute has been sold at a foreclosure sale because this court cannot fashion adequate relief, i.e.,

8

cannot reverse the transaction. See id. at 733 ("If the debtor fails to obtain a stay, and if the property is sold in the interim, the district court will ordinarily be unable to grant any relief."); United States v. Blanche, 169 F.3d 956, 957 (5th Cir. 1999); NCNB Texas Nat'l Bank v. Southwold Assocs., 909 F.2d 128, 129 (5th Cir. 1990).

The foreclosure sale and transfer to the city of Bryan effectively mooted Village's request for an injunction and mandamus because of this court's inability to fashion adequate relief. The property has been sold at a foreclosure sale and is now held by a party not before this court; the apartment complex has been torn down. Thus, any request for relief that involves a transfer of "the property" would amount to an impossible request for this court to "unscramble the eggs".

Although the injunction and mandamus requests are moot, Village's request for a declaratory judgment continues to present a live dispute because this court can still provide adequate relief. "Where several forms of relief are requested and one of these requests subsequently becomes moot, the Court [can] still consider[] the remaining requests." Powell v. McCormack, 395 U.S. 486, 496 n.8, 89 S. Ct. 1944, 1951 n.8 (1969); see also id. 395 U.S. at 499, 89 S. Ct at 1955 ("A court may grant declaratory relief even though it chooses not to issue an injunction or mandamus."). A declaration that HUD violated its regulations and

9

contracts grants Village adequate relief because, even without regaining title to the property, Village could use the declaration as a predicate for a damages action against HUD in the Court of Federal Claims. See id. (noting that "[a] declaratory judgment can then be used as a predicate to further relief"); Globe, Inc. V. United States, 227 Ct.Cl. 784 (Ct. Cl 1981) (allowing plaintiff who obtained a favorable declaratory judgment in federal district court to sue the United States for damages in the Court of Claims). The declaratory judgment aspect of this case is not moot.

## II.  REVIEWABILITY

The district court granted summary judgment in part because it found HUD's actions judicially unreviewable in light of HUD's discretion to approve or deny rent increase requests. Village argues, however, that HUD's actions are reviewable because HUD violated its regulatory and contractual duty to entertain the rent increase request.

The Administrative Procedure Act authorizes judicial review of agency decisions except when the "agency action is committed to agency discretion by law."  5 U.S.C.A. § 701(a)(2). An action is committed to agency discretion when "no judicially manageable standards are available for judging how and when an agency should exercise its discretion . . . ." Heckler v. Cheney, 470 U.S. 821, 830, 105 S. Ct. 1649, 1655 (1985).

10

The circuit courts have unanimously agreed that because Congress committed to HUD full discretion in determining whether to grant or deny a rent increase request, the decision on the amount of any increase is unreviewable.  See Frakes v. Pierce, 700 F.2d 501, 505 (9th Cir. 1983) ("[C]ourts are ill-equipped to superintend economic and managerial decisions of the kind involved here.") (quoting Hahn 430 F.2d at 1249); Langevin v. Chenango Court, Inc., 447 F.2d 296, 302-03 (2d Cir. 1971); Hahn, 430 F.2d at 1249-51.  In determining rent increase requests, HUD must delicately balance the competing interests of the property owner, the tenants, and the federal government as guarantor of the loan and payor of the Section 8 subsidy.  HUD must also take into account factors that bear on rental rates such as property taxes, utility rates, the average rental rate in the area, estimates of future maintenance needs, and vacancy rates.  See 42 U.S.C.A. 1437$f$(c)(2)(B).  Because of the lack of judicially manageable standards and HUD's need for a "flexible exercise of administrative discretion" in overseeing its properties, Hahn, 430 F.2d at 1246, courts should generally refuse to review HUD's substantive decisions regarding a rent increase request.

The district court and HUD, however, misconstrue Village's argument.  Village is not appealing HUD's denial of its requested rent increase; rather, it is appealing HUD's refusal to entertain the request and the alternative regulatory path taken by

HUD -- threatening foreclosure and demanding a multimillion-dollar equity contribution from Village. The cases previously cited universally recognize that a court's refusal to review HUD rent decisions does not necessarily obtain when HUD ignores "a plain statutory duty, exceed[s] its jurisdiction, or commit[s] constitutional error." Id. at 1251. As Village's allegations involve these very issues, its claims are reviewable.

### III. Village's Request for a Declaratory Judgment

Village seeks a declaratory judgment stating that HUD acted arbitrarily and capriciously by (1) refusing to consider Village's rent increase request; (2) declaring Village in default and subsequently foreclosing on Mockingbird because Village failed to adequately maintain the property; and (3) refusing to review its rent increase request unless Village escrowed $2 million for repairs on Mockingbird.

Village argues that its obligation to maintain the property was dependent upon HUD's providing sufficient rent revenues to pay for maintenance. According to Village, because HUD refused to approve a sufficient rental schedule, HUD acted arbitrarily and capriciously in citing poor maintenance as the reason for declaring Village in default. HUD counters that Village had an absolute duty to maintain the property, regardless of its rental income. This means that if Village's rental income was insufficient to pay all of its operating and maintenance costs,

12

Village and its financial partners must either invest additional equity to make up any deficiencies or risk default and foreclosure.

HUD's argument would perhaps be convincing if it had undertaken to review Village's rental increase request and to rule upon it. Both the Regulatory Agreement and HUD's regulations require HUD at least to entertain a rent increase request.[8] See Regulatory Agreement, ¶4(g) (stating that HUD "will at any time entertain a written request for [a rent] increase"); 24 C.F.R. § 886.312(b) (stating that once HUD receives a request, it "shall approve a rental schedule . . . or shall deny the increase stating the reasons therefor") (emphasis added). HUD violated its contractual and regulatory duty to consider the rent request. This defect renders suspect HUD's other actions, particularly when the full regulatory context is considered.

Village certainly had the duty to maintain Mockingbird "so as to provide decent, safe and sanitary housing." HAP Contract, § 14(a); see also Regulatory Agreement, § 7 ("Owners shall maintain the mortgaged premises . . . in good repair and condition."). Village's duty, however, was not absolute. Nothing

---

[8]In fact, if Village's mandamus request had not been mooted by the transfer of Mockingbird to the City of Bryan, Village would have been entitled to a mandamus to "require [HUD] to take action upon [the] matter, without directing how it shall act." Forest Guardians v. Babbitt, 174 F.3d 1178, 1190 (10th Cir. 1999) (quoting Attorney General's Manual on the Administrative Procedure Act, at 108 (1947)); see also 5 U.S.C. § 706(1) ("The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed."); N.A.A.C.P. v. Secretary of Hous. and Urban Dev. 817 F.2d 149, 160 (1st Cir. 1987).

in the National Housing Act, HUD's regulations, the Regulatory Agreement, or the HAP contract requires Village, as a low income property owner, to absorb or subsidize operating and maintenance deficiencies. Instead, the programs are designed to ensure that HUD establishes rental rates so that property owners receive enough revenue to cover all of the property's expenses including maintenance, repairs, debt service, taxes, and a six percent return on investment. See 12 U.S.C.A. § 1747c. Thus, the HUD reimbursement scheme resembles cost-plus contracts or public utility regulation, in either of which situations the private party who performs the work is assured of recovering reasonably incurred costs as well as a reasonable return on investments.

That the cost of operating and maintaining the property, in addition to the cost of complying with the Regulatory Agreement,[9] must be paid for out of the regulated rental revenues is reinforced in several ways. First, HUD's internal interpretation of its regulations indicates that operating and maintenance costs are to be derived from the rental revenues. Albert Cason, the Director of Multifamily Housing (Houston, Texas Office) and the HUD official who oversaw Mockingbird, testified

---

[9]Albert Cason, HUD's Houston Director of Multi-Family Housing, testified that rental revenues pay for the costs of complying with the Regulatory Agreement, including 1) the reserve fund for replacements, Regulatory Agreement 2(a); 2) the residual receipts fund, id. at 2(c); 3) the cost of producing and submitting the property's annual financial report, id. at 9(e); and, 4) the costs of the management contract, id. at 9(a).

that "[e]verything that comes from the project's operation is paid from the rents," and "[w]e've all agreed that the operation and maintenance of the property comes out of the rents." Similarly, HUD's handbook states that "[i]n reviewing requests from owners concerning rents and charges, the Field Office should be guided by the fact that these rents and fees should and must provide sufficient and adequate funding to operate the projects." Multifamily Asset Management and Project Servicing, United States Department of Housing and Urban Development, Handbook 4350.01 Rev-1,7-1 (September 1992); see also 42 U.S.C. § 1437*f*(c)(2)(B) (stating that HUD shall adjust the HAP contract to provide for sufficient monthly rents "to reflect increases in the actual and necessary expenses of owning and maintaining the units"); 12 U.S.C. § 1747*c*.; Beck Park, 695 F.2d at 371 ("HUD has the duty to maintain reasonable rents, based on operating costs, and to allow project owners a reasonable return on their investment.").

Second, HUD forced Village to be organized as a single asset entity, which can neither own or operate any other property nor conduct any other business besides owning the property. See Regulatory Agreement § 6(f) (prohibiting Village from engaging "in any other business or activity, including the operation of any other rental project"). Because of this requirement, Village had no source of income to maintain the property other than the rental revenues. The only way for it to obtain a sufficient amount of

15

money to pay for the needed repairs was by seeking a rent increase. HUD's refusal to consider a rent increase effectively forced Village either to default or, as HUD well knew, to seek additional equity or debt financing without assurance that these investments would be recouped.

Third, Village signed a non-recourse note, guaranteed by HUD. From the inception of HUD's program, therefore, Village was not required to support the property financially after its initial investment. Had Village not obtained a non-recourse loan, then either Village as an entity or perhaps its investors could have been made responsible to the lender (and HUD) for failure to repay or comply with terms of the loan. One HUD official put it this way: "[HUD} does not require owners to make outright cash gifts to the projects they own. After final endorsement of a mortgage, there is no requirement of owners to provide additional funds to a project." Letter from Dean K. Reger, Deputy Director of Multifamily Housing Management, to Mr. Streuby L. Drumm, Jr. (October 21, 1994).

The interplay among these aspects of the regulatory program makes clear that all of the expenses of operating and maintaining a low income housing project must be paid out of the rental revenues, which in turn are subsidized by HUD. The regulatory scheme does not contemplate that property owners must bear the risk of maintaining properties based on insufficient rental revenues. HUD could understandably refuse to provide

16

financial assistance to an owner that has misappropriated funds, mismanaged the property, taken a profit instead of maintaining the property, or been negligent in its management in some other regard. When those elements are absent, however, the statutes provide that HUD must ensure that the owner receives rents sufficient to meet at least the operating and maintenance expenses of the property. There is no statutory or regulatory basis for imposing on a conscientious low-income housing operator the risk of uncompensated dilapidation or deterioration; the federal government, not the private contractor, is charged with funding the public program.

In the case at hand, it is alleged that rental revenues approved by HUD were consistently insufficient to cover the cost of operating and maintaining the property.[10]  Village sought several rental increases over the course of its ownership of Mockingbird, but it never received the full amount requested, nor the amount it thought was necessary to maintain the property.[11]  Annual financial

---

[10]In January 1988, a HUD inspection indicated that the HUD-approved rent schedule was insufficient to satisfy Mockingbird's needs.  See Management Review Questionnaire, January 27, 1988. Seven years later, (and one month before Village requested the rent increase request involved in this case), a HUD Management Review Report also stated that the HUD-approved rent schedule was insufficient to meet Mockingbird's needs.  See Management Review Summary Sheet, May 3, 1995.

[11]In 1990, Village requested a 15% rent increase, but HUD approved a 10.4% increase.  In 1993, Village requested an 18% increase, but HUD approved only a 12% increase.  In 1994, Village requested a 15% increase, but HUD granted only a 7% increase.  The last time Village requested a rent increase, in 1995,  Village requested a 29% increase, but HUD refused to consider the request unless Village first escrowed $2 million.

audits appear to have routinely showed, moreover, that Village never misappropriated funds or squandered its revenues. Village never received a profit from Mockingbird and appears to have applied all of its revenues to cover costs of operating and maintaining the property. In addition, there was no evidence that the property was mismanaged,[12] nor did HUD ever attempt to remove the management company as it had a right to do. See Regulatory Agreement, 9(a) ("Any management contract entered into by Owners . . . involving the project shall contain a provision that it shall be subject to termination, without penalty, and with or without cause, upon written request by the Commissioner addressed to the Owners.").

---

[12]Although HUD now accuses Village of poorly maintaining Mockingbird, there is a dearth of evidence to support its claim. At most, the record reflects a concern by HUD that Mockingbird's maintenance staff was inexperienced. The record does not evince, however, the sort of wide-spread mismanagement suggested by HUD. In fact, the record reveals the opposite. For instance, in a letter written to Village less than two weeks before HUD became a mortgagee in possession, HUD conceded that it "has no current problems with the performance of the Management Company because it was presumed the company was not properly funded to effect appropriate repairs." Letter from Albert Cason, *HUD Director of Multi-Family Housing*, to Dean Earle Ross, *General Partner, Christopher Village Limited Partnership* (November 20, 1995); see also Deposition of Albert Cason, 286 (October 24, 1996) (testifying that the cause of Mockingbird's decline was not the management, but the lack of money to repair the property); HUD Management Review, Part A, A-1 (May 3, 1995) (finding that, although Mockingbird is in poor condition, "on-site management appears to be earnestly trying to make corrections with the funds and training allocated").

18

These facts reinforce Village's contention that HUD's $2 million demand was arbitrary and capricious. As noted supra, instead of considering Village's rent request, HUD determined that "no action" would be taken unless Village first escrowed $2 million. HUD cannot point to any statute, regulation, or agreement with Village giving it the discretion to table Village's rent increase request and use it as leverage to demand $2 million new equity for repairs.[13]

Because HUD acted without statutory or regulatory authority, the agency arbitrarily and capriciously demanded Village to escrow $2 million before it would consider the rent request.

HUD argues that a holding in Village's favor would mean that HUD has the duty to pay for all of a property's maintenance expenses, thus giving owners the incentive to neglect the

---

[13]Furthermore, HUD's motive in refusing to consider Village's rent request was suspect. Internal HUD e-mail showed that, for several months prior to declaring Village in default, HUD officials planned to force Mockingbird into default and thus obtain the property. Responding to one suggested course of action, one HUD official stated:

I don't think these are the same courses of action, but are parallel. They'll attempt possession through a deed in lieu; conduct the inspection and notice the owner in case they need a regulatory default and begin foreclosure as soon [as] the loan is assigned (if it['] not). Whichever action is completed first will have accomplished the desired goal: possession of the property, the quickest way possible.

E-Mail from Albert B. Sullivan to Kenneth F. Hannon et al. (April 24, 1995).

maintenance needs of their property. We disagree. This decision has no bearing on those cases where a property owner has negligently permitted the property to deteriorate or has misused its rental income in a way that has caused the maintenance problem. As noted supra, rental increase decisions are discretionary and are generally unreviewable by the courts. In this case, however, HUD acted arbitrarily and capriciously when it refused to abide by its legal obligation to consider a rental increase request from a non-negligent owner and instead demanded a $2 million cash infusion and then declared the property in default for those very reasons.

## IV.  DUE PROCESS VIOLATION

Village also argues that HUD officials violated due process by abating a single Section 8 subsidy payment. In May 1995, a HUD inspection of Mockingbird revealed that 173 out of 200 units failed HUD's Housing Quality Standard ("HSQ") review. Consequently, HUD gave Mockingbird 30 days to repair the units or face abatement of its Section 8 subsidies. A follow-up inspection revealed that all but 19 of the units were repaired; thus, HUD abated its subsidy accordingly. The abatement, which totaled $ 7,594, lasted only one month (August 1995) as the remaining 19 units later passed inspection. According to Village, HUD officials falsified the inspection reports that formed the basis of HUD's decision to abate. In addition, Village claims that "[n]one of the cited deficiencies justified abating the Section 8 payments."

20

The HAP contract gives HUD complete discretion regarding decisions to reduce Village's Section 8 subsidy. See Housing Assistance Payments Contract, § 26 (b)(2)(b) (stating that HUD may "[r]educe or suspend housing assistance payments until the default under this Contract has been cured to the satisfaction of HUD"). As with decisions whether to grant or deny rent increase requests, see supra, HUD's exercise of discretion with respect to HUD's abatement decision is unreviewable.[14] The district court correctly granted summary judgment for HUD on this issue.

**CONCLUSION**

Village's request for an injunction and mandamus is now moot because Mockingbird was sold at a foreclosure sale, transferred to the City of Bryan, and razed. Village's declaratory judgment request, however, still presents a live controversy. Because we find that HUD acted arbitrarily and capriciously in declaring Village in default after it demanded that Village pay $2 million before considering Village's rent increase request, we reverse the district court's grant of summary judgment. Upon remand, the district court should issue Village's requested declaratory judgment consistent with this opinion.

---

[14]The documents that Village proffers as proof of falsified reports are immaterial. HUD could not have possibly relied upon these documents in deciding to abate the August payment because all of the documents pre-date HUD's June 15, 1995, re-inspection that formed the basis of the abatement.

21

Appeal **DISMISSED AS MOOT** in part, **AFFIRMED** in part, and **REVERSED** in part.