CHRISTOPHER VILLAGE, LP,
and Wilshire Investments
Corp., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 99–775C.

United States Court of Federal Claims.

Filed: July 24, 2002.

As modified: Aug. 5, 2002.

E. Grey Lewis, Washington, DC, for plaintiff. Ernest C. Baynard, III, of counsel.

Steven J. Gillingham, Washington, DC, with whom were Robert D. McCallum, Jr., Assistant Attorney General and Director David M. Cohen, for defendant. Nancy Christopher and Geoffrey L. Patton, U.S. Department of Housing Urban Development, of counsel.

## OPINION

FIRESTONE, Judge.

This action is brought by plaintiffs Christopher Village, Limited Partnership ("Christopher Village") and Wilshire Investments Corporation ("Wilshire") (hereinafter referred to jointly as plaintiffs). Plaintiffs are seeking damages in connection with the government's actions in foreclosing upon plaintiffs' low-income housing complex, called Mockingbird Run Apartments, in Bryan, Texas. The complaint alleges that the foreclosure by the United States Department of Housing and Urban Development ("HUD") constituted a breach of plaintiffs' contracts with HUD.

The case is presently before the court on the parties' cross-motions for summary judgment on liability.[1] Plaintiffs claim that they are entitled to summary judgment as to liability based upon the findings and conclusions of the United States Court of Appeals

for the Fifth Circuit in *Christopher Village, LP v. Retsinas*, 190 F.3d 310 (5th Cir.1999). In that action, the Fifth Circuit determined that: 1) HUD acted arbitrarily and capriciously in declaring Christopher Village in default before it considered Christopher Village's proposal for rent increases; and 2) its declaration could be used by Christopher Village as a "predicate for damages against HUD in the Court of Federal Claims." Now that plaintiffs are before this court seeking to enforce their alleged contract rights, they contend that the Fifth Circuit's ruling bars the government from relitigating the issue of breach, and that it is therefore entitled to a finding of liability against HUD as a matter of law.

The government opposes plaintiffs' motion and argues that it is entitled to summary judgment on the grounds that even if HUD breached its contracts with plaintiffs by failing to consider its rent increase requests—a proposition the government disputes—the breach was excused by plaintiffs' prior material breach. In particular, the government argues that plaintiffs materially breached their contracts with HUD when they submitted false certificates to support the rent increases they claimed that HUD had improperly ignored. The government contends that plaintiffs' fraudulent acts provide the government with a complete defense to liability. The government also argues that in any event, HUD was justified in holding plaintiffs in default because plaintiffs had allowed the Mockingbird Run premises to fall into severe disrepair well before the plaintiffs sought the rent increases upon which this litigation is based.

## I. BACKGROUND

### A. Historic Facts

The undisputed facts may be summarized as follows. For more than twenty years,

---

1. On October 26, 2001, the court denied plaintiffs' motion to certify a class of similarly-situated HUD contractors under Rule 23 of the Court of Federal Claims. In brief, the court determined that future disposition of each putative class member's claims on both liability and damages will require an examination of the individual facts of each separate case, making the certification of a class inappropriate in this instance. The plaintiffs appealed that ruling to the Federal Circuit, and on November 29, 2001, the Circuit rejected the appeal on the grounds that a party may not seek interlocutory review of the denial of class certification under the Rules of the Court of Federal Claims ("RCFC"). *See* 25 Fed.Appx. 922 (Fed.Cir.2001) (unpublished). Following that ruling, briefing resumed on the plaintiffs' August 2, 2001 motion for partial summary judgment as to liability. The government filed its cross-motion for summary judgment as to liability on March 8, 2002.

Christopher Village owned the Mockingbird Run Apartments, a low-income housing complex with mortgages guaranteed by HUD under the National Housing Act of 1934, codified at 12 U.S.C. § 1701–1750g (2002). Under § 221(d)(3) of this Act ("Section 221"), HUD is authorized to insure loans made by private developers and others for the purpose of building and maintaining multifamily housing facilities for low and moderate income tenants. *See id.* § 1715(d)(3). The owners of Section 221 properties are allowed to sign non-recourse notes and are entitled to certain tax benefits, including accelerated depreciation. *See* 26 U.S.C. § 168(b)(4) (2002). In return for these benefits, an owner must enter into a "Regulatory Agreement" with HUD. These Regulatory Agreements give HUD extensive authority over the operation and maintenance of the subject properties. Among the obligations established by the Regulatory Agreement is the requirement that owners maintain their projects in good condition: Section 7 of the Regulatory Agreement provides that owners must, "maintain the mortgaged premises, accommodation, and the grounds and equipment appurtenant thereto, in good repair and condition." The Regulatory Agreement also contains provisions requiring that, "payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies or materials in the area where the services are rendered or the supplies or materials are furnished."

In addition to these Regulatory Agreements, HUD has statutory authority to enter into Housing Assistance Payment ("HAP") contracts pursuant to section 8 of the National Housing Act of 1937, 42 U.S.C. § 1437 (2002) ("Section 8"). Section 8 allows HUD to provide rental assistance to residents of non-government owned multi-family housing projects. 42 U.S.C. § 1437f. Under Section 8, HUD provides housing assistance payments directly to the owner. Many of the provisions of these HAP contracts are mandated by statute and regulation, including the requirement that owners maintain their projects in good repair.

The Regulatory Agreements and HAP contracts also address HUD's obligations with regard to setting rents for the subject properties. Pursuant to the Regulatory Agreements, HUD must evaluate and approve project rents. Once rents are set, HUD must also evaluate and approve any requested rent increases. Among the issues HUD must consider in evaluating a proposed rent increase are the project's operating costs and debt service (as calculated by HUD), and the owner's return on investment, with adjustments for vacancies, the project's non-rental income, and other factors HUD deems to be appropriate. *See* 24 C.F.R. § 886.112(b) (2001). With respect to properly-supported requests for rent increases, pursuant to the Regulatory Agreement, HUD is required to: "Approve [those increases] that are necessary to compensate for any net increase occurring since the last approved rental schedule, in taxes ... and operating and maintenance expenses over which Owners have no effective control, or Deny the increase stating the reasons therefor." Regulatory Agreement § 4(g). The HAP contracts provide that rents are to be adjusted according to HUD regulations and administrative procedures, and further provide that HUD may consider an owner to be in default of the HAP contract when the owner has, among other things: "furnished any false statements or misrepresentations to HUD in connection with HUD mortgage insurance, loan processing or administration of the contract."

The present case arises out of the Regulatory Agreement and HAP contracts entered into between HUD and Christopher Village. In 1995, HUD decided to take action against Christopher Village based on HUD's conclusion that the Mockingbird Run Apartments had become severely run down. At that time, HUD estimated that the cost of necessary maintenance repairs at the Mockingbird Run Apartments exceeded $1 million. As a consequence, HUD placed the project·on its list of the nation's most troubled low-income housing properties. This consequently subjected the Mockingbird Run Apartments and its managers to certain enforcement actions prescribed by a HUD enforcement program designed to identify and improve the physical

and financial conditions of HUD's most troubled subsidized properties.[2]

HUD's actions in connection with the property have already been the subject of litigation between plaintiffs and HUD. *See Christopher Village, LP v. Retsinas,* 190 F.3d 310 (5th Cir.1999). The key facts in that litigation are set forth in the Fifth Circuit's decision. In brief, in April 1995, HUD informed plaintiffs that their failure to refurbish the property could result in their loss of Section 8 rent subsidies under their HAP contract, and could lead to a default of their Regulatory Agreement. HUD took the position that under the Section 8 HAP contract and Regulatory Agreement, Christopher Village had an absolute or unconditional obligation to maintain the project. In June 1995, plaintiffs asked HUD for a rent increase in order to meet HUD's demands for refurbishing the project. Without acting on the rent increase request, HUD sent a letter to plaintiffs on August 25, 1995, reiterating its contention that Christopher Village had a contractual obligation to maintain the premises and demanding that plaintiffs place $2 million in escrow to pay for the necessary repairs. On September 6, 1995, HUD sent a second letter stating that it would not act on plaintiffs' requested rent increase until plaintiffs agreed to comply with the August 25 letter. When plaintiffs failed to place the $2 million cash infusion in escrow, HUD notified plaintiffs that they were in default of their Regulatory Agreement. As a result, the federally-insured mortgage was assigned to HUD, which took possession of the property as mortgagee in possession on December 1, 1995.

In response to HUD's actions, the plaintiffs filed suit against HUD in the United States District Court for the Southern District of Texas. In that Texas lawsuit, plaintiffs sought to set aside HUD's actions on the grounds that HUD's failure to consider their rent increase request was unlawful, the demand for $2 million was illegal, and that

without sufficient rental revenue it was impossible for plaintiffs to maintain the property. Settlement efforts failed when HUD refused Christopher Village's offer to fund the repairs through a rent increase. Subsequently, the district court denied plaintiffs' requested relief and granted summary judgment for HUD. The district court held that under Christopher Village's agreements with HUD, Christopher Village had an absolute obligation to maintain the property, without regard to HUD's approval of any rent increases. Plaintiffs' request for a stay pending appeal was denied by both the district court and court of appeals, and HUD slated the property for sale. HUD subsequently sold Mockingbird Run Apartments to the City of Bryan, Texas for $10.00.

On appeal, the Fifth Circuit found that several of plaintiffs' claims were moot by virtue of the sale of the property, but concluded that Christopher Village's claim for declaratory relief remained. Specifically, the Fifth Circuit noted that, "A declaration that HUD violated its regulations and contracts grants [plaintiffs] adequate relief because, even without regaining title to the property, [plaintiffs] could use the declaration as a predicate for a damages action against HUD in the Court of Federal Claims." *Christopher Village,* 190 F.3d at 315. After reviewing HUD's regulatory authority, the court concluded that although HUD's authority to grant or deny a rent increase is committed to HUD's unreviewable discretion, HUD could not lawfully refuse to "consider" a rent increase. The court held that under HUD's housing program, "all of the expenses of operating and maintaining a low income housing project must be paid out of rental revenues, which in turn are subsidized by HUD. The regulatory scheme does not contemplate that property owners must bear the risk of maintaining properties based on insufficient rental revenues." The court recognized that HUD could "refuse to provide financial assistance to an owner that has

---

**2.** Plaintiffs have provided the court with certain background information regarding HUD's contemporaneous increased focus on enforcement as a means of placing responsibility for maintenance on the shoulders of the owners, including the transcript of an American Bar Association workshop on HUD enforcement activities held on May 29, 1997. At that workshop, various HUD officials explained their intention to strictly enforce the maintenance requirements set forth in HUD's Regulatory Agreements and Section 8 contracts.

misappropriated funds, mismanaged the property, taken a profit instead of maintaining the property, or been negligent in its management in some other regard." The court concluded, however, that, "When those elements are absent, however, the statutes provide that HUD must ensure that the owner receives rents sufficient to meet at least the operating and maintenance expenses of the property." *Id.* at 317–18.

Based on its review of the facts then known in connection with the plaintiffs' ownership of the Mockingbird Run Apartments, the Fifth Circuit determined that plaintiffs had not been negligent and had not misused any rental income. Accordingly, the court concluded that, "HUD acted arbitrarily and capriciously when it refused to abide by its legal obligation to consider a rental increase request from a non-negligent owner and instead demanded a $2 million cash infusion and then declared the property in default for those very reasons." *Id.* at 319.

## B. Later–Discovered Facts

In 2001, after the Fifth Circuit's ruling and while the present action for damages was pending in this court, the Northern District of California resolved two legal actions involving certain parties appearing now before this court. The related litigation in California brought the following undisputed facts to light. Apparently, without HUD's knowledge, Christopher Village's general partner, Wilshire Investments Corp., had submitted false statements to HUD in connection with plaintiffs' requests for rent increases for the Mockingbird Run Apartments. These false statements were made in violation of HUD regulations and the specific terms of the HAP contract with plaintiffs, which prohibited the submittal of, "any false statements or misrepresentations to HUD in connection with HUD mortgage insurance, loan processing or administration of

the contract." The circumstances surrounding those false statements are set forth in three separate documents, collectively called the "Global Settlement": 1) the March 30, 2001 Plea Agreement entered into by the Management Assistance Group, Inc. ("MAGI") and signed by Deane Earl Ross on its behalf; 2) the March 30, 2001 Consent Judgment entered into by Wilshire, MAGI, and AFC, as well as several other AFC affiliates, and signed by A. Bruce Rozet and Mr. Ross on behalf of the AFC defendants, and by Mr. Robert Bonner, attorney for Mr. Rozet, Mr. Ross, MAGI, and Wilshire; and 3) the Administrative Agreement, again signed by Mr. Rozet, Mr. Ross, and by Mr. Bonner for Wilshire, MAGI, AFC, and its other named affiliates. This Global Settlement and the related evidence shows that MAGI—with AFC and Wilshire, among others—took advantage of its management of HUD projects to defraud HUD. As such, MAGI, AFC, and Wilshire were all party to the federal government's prosecution for the insurance scheme.[3] It is further undisputed that MAGI was itself a limited partner in the Christopher Village Limited Partnership.

In the MAGI Plea Agreement, MAGI pleaded guilty and acknowledged that it had engaged in an illegal insurance kickback scheme, in which Wilshire (on behalf of Christopher Village) and other MAGI affiliates billed HUD for insurance payments that included these illegal kickback payments. Under the scheme, MAGI procured an umbrella property insurance policy for MAGI-affiliated properties, including the Mockingbird Run property, to satisfy HUD's requirement that the properties maintain insurance. According to the Plea Agreement, MAGI defrauded HUD by requiring the insurance broker to pay a kickback to retain MAGI's business. The insurance broker, in turn, invoiced MAGI's affiliates, including Christopher Village, for the cost of both the insurance and the kickback. With respect to the

---

**3.** The above-recited facts are taken from the government's March 8, 2002 Statement of Supplementary Facts, to which the plaintiff did not respond. Under Rule 56(e) of the Federal Rules of Civil Procedure, these facts, which served as the basis for the Plea Agreement containing MAGI's guilty plea, *United States v. Management Assistance Group, Inc.,* No. CF 00–0084–SC (N.D.Cal. Mar. 30, 2001), and the Consent Judgement and Administrative Agreement in *United States v. Rozet,* No. C97–1704–SC, 2001 WL 348970 (N.D.Cal. Mar. 30, 2001), are deemed admitted. Combined, these documents establish that all four companies—Christopher Village, Wilshire, AFC, and MAGI—were intertwined for business purposes.

Mockingbird Run property, Christopher Village then provided HUD with a line-item budget that included a line-item for insurance costs.[4] In 1992, 1993, and 1995, Christopher Village supported its requests for a rent increase with these increased insurance costs. These requests also contained the certification HUD required concerning the reasonableness of the expenses.

Under the terms of the Plea Agreement, MAGI, with its principals and affiliates, agreed to take specific actions to correct their past wrongdoings and to prevent future abuses. In addition, MAGI, with its principals and affiliates, agreed to comply with the terms and conditions of a separate Consent Judgment and Administrative Agreement, which were incorporated into the Plea Agreement. Under the terms of the Consent Judgment—which, as already noted, names both AFC and Wilshire as parties—the affiliates that had participated in MAGI's scheme agreed to pay the government $8.125 million for any alleged damages arising from the scheme. The Consent Judgment further provided that if MAGI and its named affiliates, including Wilshire, fulfilled their obligations under the Consent Judgment and Administrative Agreement, they would be released from, "any administrative monetary or civil monetary claim" that the United States or HUD might have under the False Claims Act, various other statutes, and, "any other statute of common law theories, creating causes of action for civil damages or civil penalties for submitting or causing to be submitted [false] claims to the government."

In addition, under the terms of the Administrative Agreement—in which AFC and Wilshire are again identified as parties—these same affiliates agreed, among other things, to divest themselves of any general partnership interests in HUD-assisted properties. During the divestiture period, however, HUD agreed to treat requests by certain of these affiliates (including Wilshire) fairly and to renew their contracts and provide them with grants if it would be beneficial to HUD tenants. The administrative agreement also provided that HUD would not "seek civil money penalties ... for any conduct alleged as the basis for liability in the civil or criminal action, for the financial defaults resulting in the foreclosure of HUD properties prior to the date of this agreement . . . ."

Finally, the Consent Judgment provided that it could not be changed without the agreement of the parties and court approval. The Administrative Agreement similarly provided that it could not be modified without the approval of all parties.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See* RCFC 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Liberty Lobby,* 477 U.S. at 247–48, 106 S.Ct. 2505. In deciding whether summary judgment is appropriate, it is not the court's function "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. 2505.

### B. Principles of *Res Judicata* Do Not Bar the Government from Asserting a Defense to Plaintiffs' Breach of Contract Claim

Plaintiffs argue that the government is barred from challenging contract liability for

---

4. The insurance kick-back scheme was described in detail in a declaration made by Benjamin Richman, who worked as an insurance broker for the company that secured the fraudulent insurance master policy at issue. According to Mr. Richman, Christopher Village's Mockingbird Run was one of the projects included by AFC in the master policy, which included the unlawful kickback fees. Plaintiffs do not challenge the fact that the Mockingbird Run Apartments were involved in the scheme. As such, it is clear that Wilshire Investments, the general partner in the Christopher Village Limited Partnership, was part of the fraud. Again, plaintiffs never submitted any evidence or affidavit to challenge Mr. Richman's statements, which are therefore deemed true.

breach on the grounds that the Fifth Circuit's decision is *res judicata* with respect to liability. In particular, plaintiffs argue that the Fifth Circuit's conclusion that HUD violated its regulations and contracts with plaintiffs is binding on this court, and that "the government is precluded by *res judicata* from raising the defenses [raised before the Fifth Circuit], or any other, in this proceeding."

The government counters that *res judicata* does not bar the government from raising defenses to plaintiffs' breach of contract claim, because the Fifth Circuit action did not involve the same issue. According to the government, *res judicata* bars only claims or defenses that were or could have been raised in the prior action. *See Faust v. United States*, 101 F.3d 675, 677 (Fed.Cir.1996) (citing *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)). The government contends that because the Tucker Act gives the Court of Federal Claims exclusive jurisdiction over plaintiffs' breach of contract claim, that claim was not before the Fifth Circuit, and therefore the government could not have litigated its breach of contract defenses. In such circumstances, the government contends that the claim and defense preclusion aspects of *res judicata* cannot apply to bar the government from defending the breach of contract case now properly before this court.

■ The court agrees with the government. Whether a defense is barred by *res judicata* turns on whether the defense could have been raised in the prior action. As the Federal Circuit has recently noted, "under the doctrine of claim preclusion [*res judicata*] a judgment on the merits precludes the same parties from relitigating issues in a subsequent action that were or could have been raised in the prior action." *Faust*, 101 F.3d at 677. Where as here, however, the first court did not have jurisdiction over the particular claim being considered by the second court, the principles of *res judicata* do not apply. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 24 cmt. g (1980). *Res judicata* presumes that the first court had jurisdiction over the claim, even if it was not raised. However, if the claim *could not* have been

raised in the earlier proceeding, then *res judicata* cannot bar the subsequent action in the second court, or defenses to the action. As such, *res judicata* does not bar the government from raising defenses to plaintiffs' breach of contract claim in this instance.

■ While the Fifth Circuit held that, "There is no statutory or regulatory basis for imposing on a conscientious low-income housing operator the risk of uncompensated dilapidation or deterioration," *Christopher Village*, 190 F.3d at 318, it is up to *this* court to decide whether or not plaintiffs, through their actions under the contract with HUD, constituted a "conscientious low-income housing operator" such that the plaintiffs upheld their end of the contract bargain. The Fifth Circuit clearly recognized that it was up to this court to rule on the contract question, using as a "predicate" its finding that a breach had occurred when HUD failed to consider plaintiffs' rent increase requests.

This court must therefore disagree with plaintiffs' argument, and finds that *res judicata* does not bar the government from raising defenses to plaintiffs' breach of contract claim. However, as discussed at oral argument, the court recognizes that principles of collateral estoppel, or issue preclusion, do operate to bar the government from relitigating issues that were "actually litigated" before the U.S. Court for the Western District of Texas as well as the Fifth Circuit. In *Banner v. United States*, 238 F.3d 1348 (Fed. Cir.2001), the Federal Circuit held that parties are barred from revisiting issues that have been litigated by the same parties based on the same cause of action, where: "(1) the issues are identical to those in a prior proceeding, (2) the issues were actually litigated, (3) the determination of the issues was necessary to the resulting judgment, and (4) the party defending against preclusion had a full and fair opportunity to litigate the issues." *Id.* at 1354. For purposes of this litigation, then, it is plain that the government is estopped from challenging the Fifth Circuit's conclusion that its refusal to consider the plaintiffs' requests for a rent increase

violated HUD regulations and contracts.[5]

Although collateral estoppel bars the government from challenging HUD's breach, collateral estoppel does not bar the government from defending that breach based on prior material breach. There is no dispute that plaintiffs' fraudulent conduct was not litigated in the earlier lawsuit: allegations of plaintiffs' fraudulent rent requests were not presented to the court during the lawsuit in Texas, and resolution of those allegations of fraud did not occur until 2001. Indeed, the Fifth Circuit's decision is premised upon its "assumption" that plaintiffs had acted lawfully as "conscientious low-income housing operators."

In view of the forgoing, because neither the principles of *res judicata* nor collateral estoppel bar the government from raising a defense to plaintiffs' breach claim, the court now turns to those defenses.

### C. Plaintiffs' Submission of Fraudulent Rent Requests Constitutes a Prior Material Breach

The plaintiffs do not dispute that they submitted false certifications in support of their rent increase requests and that plaintiffs used HUD funds to pay for, at least in part, illegally-inflated insurance costs. As noted above, plaintiffs have not presented any facts to challenge the government's supplementary findings of uncontroverted fact, which state that MAGI entered a guilty plea based in part upon its having received illegally-inflated insurance expenses from HUD in the form of rents received for their HUD properties, including Mockingbird Run Apartments. The undisputed facts establish that plaintiffs violated the following Regulatory Agreement provisions: (1) the prohibition on disbursement of project funds for anything other than "reasonable operating expenses and necessary repairs"; and (2) the requirement that "payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies or materials in the area where the services are rendered." In addition, these illegally-inflated insurance charges violated plaintiffs' HAP contract, which required justifications of the reasonableness of expense increases and required owners to submit certifications attesting to the reasonableness of those expenses. Here, the undisputed facts establish that Wilshire, on behalf of Christopher Village, submitted certifications to HUD seeking rent increases for the Mockingbird Run Apartments, including a share of the illegally-inflated insurance premiums from the scheme arranged through AFC and MAGI.[6]

These facts establish that plaintiffs committed a prior material breach of the HUD contracts, even though the U.S. government was not aware of the facts at the time of the foreclosure at issue in this litigation. It is well-settled that prior material breach excuses a subsequent breach by the government. "A party to a contract who is sued for its breach may ordinarily defend on the ground that there existed, at the time, a legal excuse for nonperformance by him, although he was then ignorant of the fact." *College Point Boat Corp. v. United States*, 267 U.S. 12, 15, 45 S.Ct. 199, 69 L.Ed. 490 (1925). *See also, Mega Constr. Co. v. United States*, 29 Fed.Cl. 396, 421–22 (1993) ("Any extant reasons supporting a default termination are sufficient to sustain the default, even if not known or discovered until after

---

**5.** In the alternative, the government argues that plaintiffs had historically sought inadequate rent increases to meet HUD's maintenance requirements, which also excuses the government's breach. Plaintiffs argue that the government is also estopped from raising this argument. Because the undisputed fraud discussed *infra* is dispositive, the court need not reach this issue.

**6.** At oral argument, plaintiff made much of the fact that Christopher Village, the limited partner and project "owner," was not found guilty of anything related to MAGI's and Wilshire's fraudulent conduct. First, that is not true. MAGI was a limited partner in the Christopher Village partnership, and Wilshire signed the HAP contract with HUD on behalf of Christopher Village. Second, Christopher Village cannot separate itself from the acts of its general partner, Wilshire. In such circumstances, the court has no basis to hold that the Christopher Village Limited Partnership is not liable for the acts of the general partner Wilshire, and its ultimate owner AFC, especially because those acts were performed in concert with MAGI, which was both an affiliate of AFC and a limited partner in the Christopher Village project itself.

the decision to terminate for default is made."). This court therefore finds that as a matter of law, the government was within its rights to not consider the request for rent increases in 1995 on the grounds that the rent increase requests were based in part on fraudulent certifications. Irrespective of plaintiffs' failure to properly maintain the property, plaintiffs' fraudulent conduct in any event would have justified the government's termination of the HUD housing contracts. *See generally Joseph Morton Co., Inc. v. United States*, 757 F.2d 1273, 1277–79 (Fed. Cir.1985) ("It is settled law that a party can justify a termination if there existed at the time an adequate cause, even if then unknown. . . . [A]ny fraud warrants termination for default as a matter of law."). Thus, the fraudulent conduct of MAGI and Wilshire, in connection with the rent requests for the Mockingbird Run Apartments, constitutes a prior material breach of the HUD contracts which justifies HUD's termination of plaintiffs' contract for default.

## D. Nothing in the Global Settlement Bars the Government's Reliance on the Defense of Prior Material Breach

■ As described above, plaintiffs do not meaningfully contest that the actions of MAGI and Wilshire, taken in connection with the rent requests for Mockingbird Run Apartments, constitute a prior material breach of the contract between plaintiffs and HUD.[7] Instead, the plaintiffs argue that the "Global Settlement" reached in the MAGI litigation—the March 30, 2001 Consent Judgment issued by the U.S. District Court for the Northern District of California, the Administrative Agreement incorporated therein, and MAGI's March 30, 2001 Plea Agreement—bars the government's reliance on the facts demonstrating plaintiffs' breach to support the termination in this case.

To make this argument, plaintiffs rely on a declaration by Daniel S. Floyd, counsel to MAGI and the AFC defendants during the litigation in the California district court. According to Mr. Floyd:

After more than three years of very strongly contested litigation between the Government and the AFC defendants, the parties began discussions in Fall 2000 to seek a global resolution of the pending litigation. On behalf of our clients, we communicated to the Government our insistence that any settlement be truly "global," and include resolution of the pending criminal investigation and, importantly, resolving any and all HUD administrative action that might result from a complete criminal and civil settlement. This was because, as we explained to HUD, the AFC Defendants did not want HUD to use the fact of the settlement to take administrative action against those HUD-assisted projects in which the AFC Defendants had involvement, no matter how minor. The only way to avoid this was to identify and agree on all the administrative consequences of the proposed civil and criminal settlement. . . . The $8.125 million civil payment was intended to compensate the Government in full for any alleged damages arising from the AFC Defendant's [sic] alleged practices relating to insurance and management fees.

The government counters that the terms of the Global Settlement do not bar the government from relying upon the existence of the fraudulent certifications to prove its defense from material breach. The court must agree. There is nothing in any of the documents associated with MAGI's plea that bars the government from relying upon the admitted acts of fraud in order to defend the breach of contract claim. The Plea Agreement does not bar the government from relying upon it in a civil action, and the Administrative Agreement limits the United States' rights to "suspend and debar" Wilshire or to "seek civil money penalties . . . for any conduct alleged as the basis for liability in the civil or criminal action, [or] for the financial defaults resulting in the foreclosure of HUD Properties prior to the date of this Agreement . . . ." Here, the government is not seeking any penalties, but defending itself from liability. Similarly, under the Consent Judgment, the government agreed to "re-

---

7. *See supra* note 6.

lease all Defendants from any administrative monetary or civil monetary claim that the United States or HUD" had against them.

Thus, while the United States agreed to forego taking any further *affirmative* enforcement actions—to either seek further penalties or to continue to press affirmative suits—against Wilshire, the Global Settlement says nothing regarding the government's ability to *defend* itself from claims levied by parties involved in the action. For this reason, the court finds that the government's reliance upon the uncontroverted facts establishing plaintiffs' prior material breach, in order to defend itself against plaintiffs' action in this court, does not run afoul of the conditions of the Global Settlement.

### III. CONCLUSION

Having decided that the government is not barred from defending itself against plaintiffs' breach of contract claims, the court finds that the government's termination of plaintiffs' HUD contracts was excused by plaintiffs' prior material breach, the fraudulent insurance scheme perpetrated by MAGI, AFC, and Wilshire. As such, plaintiffs' August 2, 2001 motion for partial summary judgement as to liability is **DENIED**, and the government's March 8, 2002 cross-motion for summary judgment is **GRANTED**. No further proceedings are required in this matter, and the claim is hereby **DISMISSED**. Each party to bear its own costs.