**CHRISTOPHER VILLAGE, L.P. and Wilshire Investments Corp., Plaintiffs–Appellants,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 02–5188.

United States Court of Appeals, Federal Circuit.

March 8, 2004.

E. Grey Lewis, of Washington, DC, argued for plaintiffs-appellants. Of counsel on the brief was E.C. Baynard, Baynard & Cartner, of Washington, DC.

Steven J. Gillingham, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. Of counsel were David M. Cohen, Director; and Nancy Christopher, Attorney, Office of General Counsel, Department of Housing and Urban Development, of Washington, DC.

Before LOURIE, GAJARSA, and DYK, Circuit Judges.

DYK, Circuit Judge.

This case presents the question whether a federal district court has jurisdiction to issue a declaratory judgment as to the government's liability for breach of contract solely in order to create a "predicate" for suit to recover damages in the Court of Federal Claims. We hold that district courts do not have such jurisdiction because the Court of Federal Claims has exclusive jurisdiction under the Tucker Act, 28 U.S.C. § 1491 (2000), to adjudicate breach of contract claims for money damages in excess of $10,000, and Congress has not waived sovereign immunity for such suits in district courts.

Here, the United States District Court for the Southern District of Texas, and on appeal the United States Court of Appeals for the Fifth Circuit, lacked jurisdiction to issue such a "predicate" judgment, and the "predicate" judgment was void. It follows that the Court of Federal Claims was not bound by this earlier judgment.

On the merits, we affirm the Court of Federal Claims' grant of summary judgment. We agree that the contract between the government and the appellants was unenforceable against the government because of a material breach by the appellants predating the government's alleged breach.

## BACKGROUND

### I

The National Housing Act was designed to "assist private industry in providing housing for low and moderate income families and displaced families." 12 U.S.C. § 1715l(a) (2000). It authorized the Department of Housing and Urban Development ("HUD") to insure mortgages used to construct certain low-income housing. *Id.* § 1715l(b). Owners of such properties were also entitled to certain tax benefits. *See Chancellor Manor v. United States,* 331 F.3d 891, 894 (Fed.Cir.2003). In return for this mortgage insurance and tax benefits along with various other benefits, landlords agreed to be "regulated or supervised ... by the Secretary under a

regulatory agreement." 12 U.S.C.A. § 1715l(d)(3) (West Supp.2003).

The appellants, Christopher Village, L.P. and its managing general partner, Wilshire Investments Corp., owned a federally subsidized low-income housing complex known as Mockingbird Run Apartments ("Mockingbird Run"). Mockingbird Run was built in 1970 with an insured mortgage obtained under the National Housing Act, id. §§ 1701–1750g (2000). In accordance with National Housing Act requirements, the appellants entered into a standard regulatory agreement with HUD concerning Mockingbird Run (the "Regulatory Agreement"). The Regulatory Agreement required the appellants to "maintain the mortgaged premises ... in good repair and condition." Regulatory Agreement ¶ 7 (App. at 2002). See also 24 C.F.R. § 221.530(b) (1995). The agreement authorized HUD to regulate rents. Regulatory Agreement ¶ 4(f) (App. at 2001) ("The rent charged for each unit shall not exceed the upper limit of the range shown for such type of unit on the rental schedule approved in writing by the Commissioner [of HUD] ...."); see also 12 U.S.C. § 1747c (2000) ("[T]he investor shall not charge or collect rents for any dwellings in the project in excess of the appropriate rents therefor as shown in the latest rent schedule approved pursuant to this section."). According to HUD regulations, HUD-approved rent schedules were meant to "compensate for any increase in ... operating and maintenance costs over which owners have no effective control...." 24 C.F.R. § 886.112(b) (1995). The Regulatory Agreement also stated that the landlord could not increase "the amount of the gross monthly dwelling income for all units ... unless such increase is approved by the Commissioner." Regulatory Agreement ¶ 2(g) (App. at 2001); see also 24 C.F.R. § 886.112(b) (1995).

The appellants also entered into a Housing Assistance Payment contract (the "HAP Contract") with HUD pursuant to the United States Housing Act, 42 U.S.C. § 1437f (2000). (App. at 2100.) That Act authorized HUD to enter into contracts with landlords to subsidize rental payments of tenants living in private, low-income housing. See Cisneros v. Alpine Ridge Group, 508 U.S. 10, 12, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993). Under the HAP Contract, the appellants received "assistance payments" in "an amount calculated to make up the difference between the tenant's contribution and the contract rent agreed upon by the landlord and HUD." See id. (internal quotations omitted). Like the Regulatory Agreement, the HAP Contract regulated the appellants' management of Mockingbird Run, prohibiting the appellants from "charg[ing] any family an amount in excess of the" set allowable rents and requiring the appellants to "maintain and operate the contract units and related facilities so as to provide decent, safe and sanitary housing as defined by HUD." (App. at 2102.)

II

By 1995, the physical condition of Mockingbird Run had substantially deteriorated, necessitating approximately $2 million worth of repairs. Finding that the appellants had allowed the complex to deteriorate in violation of the Regulatory Agreement and the HAP Contract, HUD informed the appellants in April of 1995 that their failure to refurbish the property could lead to a default of the Regulatory Agreement and loss of the HAP Contract rent subsidies.

Thereafter, on June 23, 1995, the appellants requested a twenty-nine percent rent increase from HUD, claiming that the current rent revenue was inadequate to cover operating costs as well as maintenance and

repairs. HUD sent the appellants a letter on August 25, 1995, explaining that the Regulatory Agreement and HAP Contract imposed an absolute obligation on the appellants to maintain the property. The letter did not decide the appellants' rent increase request, but it instead demanded that the appellants deposit approximately $2 million in escrow to fund Mockingbird Run's needed repairs. The appellants did not deposit the $2 million. On September 6, 1995, HUD sent the appellants a second letter explaining that it would not entertain the appellants' request for a rent increase unless they deposited the $2 million in escrow as the August letter demanded. The appellants again refused to pay the $2 million, and on September 14, 1995, HUD informed the appellants that they "had violated ... the Regulatory Agreement by not maintaining the mortgaged premises in good repair and condition [and that] HUD would proceed without further notice to take whatever remedies are appropriate." *Christopher Vill., L.P. v. Retsinas,* 190 F.3d 310, 313 (5th Cir.1999) (internal quotations omitted). On November 17, 1995, the Federal National Mortgage Association, the original lender, assigned the note and mortgage to HUD, and "HUD assumed control of the property as a mortgagee in possession" on December 1, 1995. *Id.* (explaining that once the Federal National Mortgage Association assigned the note to HUD, HUD "had the same remedial rights as the original lender"); *see* 24 C.F.R. § 207.255(a)(2) (2003); *see also United States v. Antioch Found.,* 822 F.2d 693, 695 (7th Cir.1987) (stating "in determining when to foreclose following a default, HUD has very broad discretion in order to achieve national housing objectives").

### III

In October of 1995 the appellants brought suit in the United States District Court for the Southern District of Texas against HUD, the Secretary of HUD, and the Director of Multifamily Housing Management of the Houston Area Office of HUD, seeking mandamus, injunctive and declaratory relief pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 702, 706 (2000) ("APA"). *Christopher Vill., L.P. v. Cuomo,* No. Civ. H–95–5005, 1998 WL 422854 (S.D.Tex. Mar. 2, 1998). Arguing that HUD illegally demanded $2 million in escrow and illegally refused to consider its request for a rent increase, the appellants sought mandamus and injunctive relief to prevent HUD from foreclosing on the Mockingbird Run property. The appellants also sought a declaratory judgment that their obligation to maintain the property was contingent upon receiving adequate rent revenue and that they were under no duty to make repairs unless they received adequate rent increases. In March of 1998 the district court granted summary judgment in favor of HUD on all counts, holding that HUD's decisions whether to grant rent increases were unreviewable and that the appellants had an absolute responsibility to properly maintain the property irrespective of rent increases. *Id.* at *34.

The appellants appealed to the United States Court of Appeals for the Fifth Circuit. While the case was pending in the Fifth Circuit, HUD sold the property in a foreclosure sale, and it was razed. *Christopher Vill.,* 190 F.3d at 312. The Fifth Circuit held that HUD's "foreclosure sale and transfer ... effectively mooted [the appellants'] request for an injunction and mandamus because of [the] court's inability to fashion adequate relief" since the "request for relief ... involve[d] a transfer of the property [that] amount[ed] to an impossible request for [the] court" to fulfill. *Id.* at 314–15 (internal quotations omitted). Nonetheless, the Fifth Circuit

held that the request for a declaratory judgment still "present[ed] a live dispute" because the appellants "could use the declaration as a predicate for a damages action against HUD in the Court of Federal Claims." *Id.* at 315.

On the merits, the Fifth Circuit agreed with the district court that HUD decisions regarding requests for rent increases were indeed unreviewable under the APA because "Congress committed to HUD full discretion in determining whether to grant or deny a rent increase request." *Id.* However, the Fifth Circuit found that both the Regulatory Agreement and HUD's own regulations required "HUD at least to entertain a rent increase request." *Id.* at 316 (citing Regulatory Agreement ¶ 4(g), stating that HUD "will at any time entertain a written request for [a rent] increase" and 24 C.F.R. § 886.312(b), stating that in response to a request for a rent increase, HUD "shall approve a rental schedule ... or shall deny the increase stating the reasons therefor"). The court held that HUD "violated its contractual and regulatory duty to consider the rent request ... [thereby] render[ing] suspect HUD's other actions." *Id.* The Fifth Circuit further stated that the appellants' duty to properly maintain Mockingbird Run "was not absolute" and that the appellants' "cost of operating and maintaining the property, in addition to the cost of complying with the Regulatory Agreement, must be paid for out of the regulated rental revenues." *Id.* at 316–17. Although the Fifth Circuit found that "HUD could understandably refuse to provide financial assistance to an owner that has misappropriated funds, mismanaged the property, taken a profit instead of maintaining the property, or been negligent in

its management in some other regard," the court held that there was no evidence establishing that any of these things had occurred. *Id.* at 317–18.

The Fifth Circuit accordingly reversed the district court's grant of summary judgment. It found that "HUD acted arbitrarily and capriciously when it refused to abide by its legal obligation to consider a rental increase request from a non-negligent owner and instead demanded a $2 million cash infusion and then declared the property in default for those very reasons." *Id.* at 319. The court ordered that "[u]pon remand, the district court should issue [the appellants'] requested declaratory judgment." *Id.* HUD did not seek further review of the Fifth Circuit's decision. Neither, apparently, did the appellants seek a declaratory judgment from the district court as provided by the Fifth Circuit.

## IV

On September 21, 1999, the appellants filed an action in the Court of Federal Claims for breach of contract, seeking certification of a class of similarly situated entities. Appellants contended that they were entitled to a finding of liability against HUD as a matter of law because the Fifth Circuit's ruling barred the government from relitigating the issue of breach of contract under the doctrine of res judicata.

Initially, the Court of Federal Claims denied the appellants' motion for class certification on October 26, 2001, finding that the appellants did not satisfy the *Quinault* requirements for certification, *see Quinault Allottee Ass'n v. United States,* 197 Ct.Cl. 134, 453 F.2d 1272 (1972).[1] *Christo-*

---

1. These factors include: (1) whether the class is large but manageable; (2) whether there is a question of law common to the whole class; (3) whether the common question of law pre-

dominates over individual questions of fact; (4) whether the plaintiff's claim is typical of those claimed by the class; (5) whether the government's action is generally applicable to

*pher Vill., L.P. v. United States,* 50 Fed. Cl. 635 (2001). In particular, the Court of Federal Claims found that common questions of law did not predominate over individual factual questions of class members; that the appellants' claim was not sufficiently typical of the class; and that the claims of individual class members were not necessarily too small to be pursued individually. *Christopher Vill.,* 50 Fed.Cl. at 642–44.

In 2001, while the damages action was pending in the Court of Federal Claims, criminal litigation regarding a fraudulent insurance scheme related to HUD projects was settled in the United States District Court for the Northern District of California. This litigation involved the Management Assistance Group, Inc. ("MAGI"), a company that shared a president and sole shareholder with Wilshire and was a limited partner of Christopher Village. The settlement of this criminal litigation on March 30, 2001, was effectuated through a plea agreement ("the Plea Agreement"). In the Plea Agreement MAGI pled guilty to engaging in an illegal insurance kickback scheme, which involved Mockingbird Run as well as other HUD projects. Although neither Wilshire nor Christopher Village was a party to this Plea Agreement, Wilshire was a party to both the Consent Agreement and the Administrative Agreement, which, while not admitting any wrongdoing by Wilshire, barred future government claims against Wilshire.

HUD required MAGI to procure insurance for its affiliated properties, including Mockingbird Run. MAGI admitted that it required illegal kickbacks from the insurance company that covered its affiliated properties in order to retain its insurance business. The insurance company in turn inflated the true costs of insurance for these HUD-project properties, and it invoiced MAGI's affiliated properties, including Mockingbird Run, for the kickback costs as well as the actual insurance costs. These inflated insurance charges were then included as an expense item in documentation that the appellants subsequently submitted to HUD in 1992, 1994, and 1995 in order to justify rent increase requests for Mockingbird Run. *See generally* HUD Housing Handbook: Multifamily Asset Management and Project Servicing, Chapter 7: Processing Budgeted Rent Increases and Fees for Commercial Space & Services in Insured, Direct Loan and Non-Regulated HUD Project (Doc. No. 4350.1), *available at* http://www.hudclips.org. The appellants also submitted a "Certification as to Purchasing Practices and Reasonableness of Expenses" with each of these requests, in which the appellants certified that "[a]mounts paid to individuals or companies having an identity-of-interest with the owner or the management agent were not excess of the costs that would have been incurred in making arms-length purchases on the open market." (App. at 2577.) HUD granted the appellants rent increases in 1992 and 1994 for Mockingbird Run.

Subsequent to these events, the parties filed cross motions for summary judgment, and the Court of Federal Claims entered summary judgment in favor of the government. *Christopher Vill., L.P. v. United States,* 53 Fed.Cl. 182 (2002). The government claimed that the MAGI plea evidenced a prior material breach by the appellants, thereby excusing the government of liability for any later breach that

the class; (6) whether the claims of the class members are too small to be pursued individually; (7) whether the plaintiff will adequately represent the class; and (8) whether individual actions would create the risk of varying adjudications. *Christopher Vill.,* 50 Fed.Cl. at 643 (citing *Quinault,* 453 F.2d at 1272).

HUD may have committed by refusing to consider the rent requests. The appellants, however, argued that they were entitled to a judgment of liability as a matter of law because res judicata required the Court of Federal Claims to accept the Fifth Circuit's liability holding.

The court rejected the appellants' argument that it was bound by the Fifth Circuit's decision, reasoning that neither res judicata nor collateral estoppel prohibited it from considering the government's prior breach defense. The court concluded that "res judicata presumes that the first court had jurisdiction over the claim ... [and the] Fifth Circuit clearly recognized that it was up to this court to rule on the contract question." *Id.* at 188. The Court of Federal Claims further explained that "[a]lthough collateral estoppel bars the government from challenging HUD's breach [for failure to consider the appellants' rent increase request], collateral estoppel does not bar the government from defending that breach based on prior material breach" because the Fifth Circuit did not decide the issue. *Id.* at 189. On the merits, the court found that the appellants committed a prior material breach that protected the government against liability for HUD's subsequent assumed breach because the appellants had not provided any evidence to rebut "the fact that Mockingbird Run Apartments were involved in the [MAGI] scheme ... [and] that Wilshire Investments, the general partner in the Christopher Village Limited Partnership, was part of the fraud." *Id.* at 187 n. 4. The court concluded that "the fraudulent conduct of MAGI and Wilshire, in connection with the rent requests for the Mockingbird Run Apartments, constitutes a prior material breach of the HUD contracts which justifies HUD's termination of the plaintiffs' contract for default." *Id.* at 190. The court held that this prior material breach excused HUD's assumed subsequent breach, "even though the U.S. government was not aware of the facts at the time of the foreclosure at issue in this litigation." *Id.* at 189. Finally, the court held that there was no settlement bar to the government's defense of prior material breach. *Id.* at 191.

Christopher Village and its managing general partner, Wilshire, appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

We review the Court of Federal Claims' grant of summary judgment without deference. *Agwiak v. United States*, 347 F.3d 1375, 1377 (Fed.Cir.2003).

### I

Appellants argue first that the Fifth Circuit's decision "is res judicata" and precludes the government from challenging its liability for breach. (Appellants' Br. at 32.) Appellants therefore contend that the Fifth Circuit's decision entitles them to judgment as a matter of law on the breach of contract claim. We disagree.

Initially, we must determine whether the Fifth Circuit had jurisdiction to issue a judgment as a "predicate" to a suit in the Court of Federal Claims. *See* Restatement (Second) of Judgments, at 13 (1982); *see also id.* at 19. As we recently reaffirmed in *Fieldturf, Inc. v. Southwest Recreational Indus., Inc.*, 357 F.3d 1266, 1268 (Fed.Cir.2004), in circumstances such as these, the court of appeals' jurisdiction is dependent on the district court's jurisdiction. *See* 28 U.S.C. § 1291. Accordingly, the Fifth Circuit had jurisdiction to issue this "predicate" judgment only if a district court would have had jurisdiction to issue such an order.

In order for a district court to have properly had jurisdiction, the government must have waived sovereign immunity to suit. As the Supreme Court recently noted in *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003), "[j]urisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity ... together with a claim falling within the terms of the waiver." *See also United States v. Mitchell*, 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."); *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941) ("The terms of [the sovereign's] consent to be sued in any court define that court's jurisdiction to entertain the suit."); *Consol. Edison Co. v. United States*, 247 F.3d 1378, 1382 (Fed.Cir.2001) ("To invoke the jurisdiction of a federal court for relief from monetary obligations imposed by a federal agency, a litigant must show that the United States has waived sovereign immunity."). The APA has "broaden[ed] the avenues for judicial review of agency action by eliminating the defense of sovereign immunity in cases covered by" its provisions. *Bowen v. Mass.*, 487 U.S. 879, 891–92, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988); *see also Darby v. Cisneros*, 509 U.S. 137, 153, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993). But the waiver of sovereign immunity under the APA is limited. *See, e.g., Bowen*, 487 U.S. at 904 n. 39, 108 S.Ct. 2722.

The APA waives sovereign immunity for suits to "set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(a) (2000), when the suit calls for "relief other than money damages," *id.* § 702, but only if "there is *no other adequate remedy*," *id.* § 704 (emphasis added). This limits the government's waiver of sovereign immunity to situations in which "no other adequate remedy" exists. *Bowen*, 487 U.S. at 902, 108 S.Ct. 2722. Here, the necessary waiver of sovereign immunity existed as to the appellants' claim for injunctive relief because no other adequate remedy existed to prevent the foreclosure and sale. Thus, there is no question that the District Court for the Southern District of Texas properly had jurisdiction over the original action to enjoin foreclosure by the government. But, as the Fifth Circuit correctly held, the claim that originally formed the basis for this jurisdiction under the APA, namely the request to enjoin HUD's foreclosure and sale, became moot when HUD foreclosed on and sold Mockingbird Run. *Christopher Vill.*, 190 F.3d at 314. At that point, the appellants' sole claim was for a declaratory judgment as to the legality of HUD's actions, and jurisdiction over this claim turned on whether the APA waived the United States' sovereign immunity to suit for such a declaratory judgment. This depended on whether suit in the Court of Federal Claims for money damages constituted an "adequate remedy" under section 704 of the APA.

We held in *Consolidated Edison* that a litigant's ability to sue the government for money damages in the Court of Federal Claims is an "adequate remedy" that precludes an APA waiver of sovereign immunity in other courts. 247 F.3d at 1384. The plaintiff in *Consolidated Edison* sued the government in the United States District Court for the Southern District of New York under the APA for declaratory and injunctive relief, alleging that the special assessments imposed by the Energy Policy Act of 1992 ("EPACT") violated due process and constituted a taking under the Fifth Amendment. *Id.* at 1380. The gov-

ernment moved to have the case transferred to the Court of Federal Claims, but the district court denied the transfer. *Id.* at 1381–82. The plaintiff appealed this denial of transfer to our court pursuant to 28 U.S.C. § 1292(d)(4)(A), which gives our court exclusive jurisdiction over an appeal from a district court's denial of a motion to transfer to the Court of Federal Claims. We held that the district court lacked jurisdiction under section 704 of the APA because "[e]very legal issue that [the plaintiff sought] to resolve in this district court case could [have been] ... decided in a suit before the Court of Federal Claims ... [and] a refund of the EPACT payments could [have] provide[d] an *adequate remedy*" for the plaintiff. *Id.* at 1385 (emphasis added). We further emphasized in *Consolidated Edison* that, "[a] party may not circumvent the Claims Court's exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory or mandatory relief where the thrust of the suit is to obtain money from the United States." *Id.* (quoting *Rogers v. Ink,* 766 F.2d 430, 434 (10th Cir.1985));[2] *see also Kanemoto v. Reno,* 41 F.3d 641, 646 (Fed.Cir.1994). ("[R]elief available for [the plaintiff's] claims in the Court of Federal Claims is 'adequate' ... [and the plaintiff] cannot escape this conclusion merely by framing her claim for relief in declaratory or injunctive terms....").

Our sister circuits have come to the same conclusion. *See, e.g., Deaf Smith County Grain Processors, Inc. v. Glickman,* 162 F.3d 1206, 1210–11 (D.C.Cir. 1998) ("[T]he Tucker Act—which waives sovereign immunity and provides the United States Court of Federal Claims (Claims Court) with jurisdiction over certain claims for monetary relief from the federal Government, *see* 28 U.S.C. § 1491—provides an adequate remedy' in the Claims Court, which would preclude district court jurisdiction under § 704 of the APA."); *Randall v. United States,* 95 F.3d 339, 346 (4th Cir.1996) ("[R]eview under the APA is available only for 'final agency action *for which there is no other adequate remedy in a court*' ... This limitation has been interpreted to preclude review under the APA when a plaintiff has an adequate remedy by suit under the Tucker Act.... Therefore, to determine whether Plaintiff's suit is cognizable under the APA, the court must first examine whether he has an available remedy under the Tucker Act.") (emphasis in original); *Marshall Leasing, Inc. v. United States,* 893 F.2d 1096, 1099 (9th Cir.1990) ("A party may not avoid the [Court of Federal Claims'] jurisdiction by framing an action against the federal government that appears to seek only equitable relief when the party's real effort is to obtain damages in excess of $10,000"); *Rogers,* 766 F.2d at 434 ("A party may not circumvent the Claims Courts' exclusive

**2.** In *Consolidated Edison,* we explained that this conclusion was consistent with the Supreme Court's reasoning in *Bowen.* In *Bowen,* the Court held that the Court of Federal Claims does not always present an "adequate remedy" to defeat APA jurisdiction in suits for monetary relief, reasoning that it was "not willing to assume, categorically, that a naked money judgment against the United States will always be an adequate substitute for prospective relief...." 487 U.S. at 905, 108 S.Ct. 2722. However, we held in *Consolidated Edison* that "*Bowen* ... does not enunciate a

broad rule that the Court of Federal Claims cannot supply an adequate remedy in any case seeking injunctive relief." *Consol. Edison,* 247 F.3d at 1383. Rather, *Bowen* "linked its judgment to a specific set of circumstances" where the monetary relief sought implicated the potential for prospective relief as well and "involv[ed] state governmental activities that a district court would be in a better position to understand and evaluate." *Id.* at 1384 (quoting *Bowen,* 487 U.S. at 907–08, 108 S.Ct. 2722).

jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory or mandatory relief where the thrust of the suit is to obtain money from the United States.").

The Fifth Circuit itself has repeatedly emphasized the limited nature of the APA's waiver of sovereign immunity where there is an adequate remedy in the Court of Federal Claims. For example, in *Warner v. Cox*, 487 F.2d 1301 (5th Cir. 1974), the Fifth Circuit held that it did not have jurisdiction to grant an injunction compelling the Navy to make certain contractual payments. *Id.* at 1307. Despite the contractor's argument that his "sole claim below was for review of administrative errors committed in the process of [the Navy] refusing" his payments, the court found that "[n]one of the substantive claims presented to the court below concerned anything but the payment of money...." *Id.* at 1304. The Fifth Circuit reasoned:

> [T]he APA does not provide for review under such circumstances. Specifically exempted from review is agency action for which there is some "... other adequate remedy in a court." 5 U.S.C. § 704. Suit under the Tucker Act in the Court of Claims has been held such an adequate remedy.... Congress' judgment seems to be that Tucker Act relief is adequate ... and to that judgment we defer.

*Id.* As such, the Fifth Circuit remanded with instructions to dismiss for want of jurisdiction, stating, "[w]e are in Court of Claims country where we do not belong." *Id.* at 1307.

In *Drake v. Panama Canal Commission*, 907 F.2d 532 (5th Cir.1990), the Fifth Circuit refused to entertain an APA claim for mandamus relief to require the Panama Canal Commission to pay certain survivor compensation. The Fifth Circuit

held that "because ... the substance of the complaints at issue is a claim for money damages, appellant's case is not one covered by section 702,. and, hence, sovereign immunity has not been waived. As a result, the APA does not afford jurisdiction over appellants' suit." *Id.* at 535. More recently in *Armendariz–Mata v. Department of Justice*, 82 F.3d 679 (5th Cir. 1996), the Fifth Circuit stressed that "when the substance of the complaint at issue is a claim for money damages, the case is not one covered by § 702, and hence, sovereign immunity has not been waived" and the court does not have jurisdiction to entertain it. *Id.* at 682 (citation omitted). Because the Fifth Circuit lacked jurisdiction to award relief, the appeal should have been dismissed. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 287, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000); *Church of Scientology v. United States*, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992).

There is no question that the appellants here could have originally sued the United States in the Court of Federal Claims to recover for breach of contract. Indeed, that is the very premise of the Fifth Circuit's "predicate" decision. Under these circumstances we must conclude that the Fifth Circuit lacked jurisdiction over the action for declaratory judgment because the APA did not waive the United States' sovereign immunity for such a suit in district courts.

## II

 However, the fact that a court did not have jurisdiction over a suit in which it issued a decision does not automatically strip that decision of preclusive effect. In most circumstances a judgment may not be collaterally attacked on the ground that the original tribunal lacked subject matter jurisdiction, even if the is-

sue of subject matter jurisdiction has not been litigated in the first action. *See, e.g., Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702 n. 9, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982) (explaining that principles of res judicata apply to issues of subject matter jurisdiction, and that "[a] party that has had an opportunity to litigate the question of subject matter jurisdiction may not ... reopen that question in a collateral attack upon adverse judgment"); *Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n,* 455 U.S. 691, 708–10, 102 S.Ct. 1357, 71 L.Ed.2d 558 (1982); *Chicot County Drainage Dist. v. Baxter State Bank,* 308 U.S. 371, 377–78, 60 S.Ct. 317, 84 L.Ed. 329 (1940); *Swift & Co. v. United States,* 276 U.S. 311, 326, 48 S.Ct. 311, 72 L.Ed. 587 (1928). The Restatement similarly notes that a court's "judgment precludes the parties from litigating the question of the court's subject matter jurisdiction" on collateral review. Restatement (Second) of Judgments § 12 (1982). The Restatement, however, also recognizes exceptions to this rule, including when "[a]llowing the judgment to stand would substantially infringe the authority of another tribunal or agency of government." *Id.* § 12(2); *see In re Bulldog Trucking, Inc. v. Productive Transp. Servs., Inc.,* 147 F.3d 347, 354 (4th Cir. 1998); *Sterling v. United States,* 85 F.3d 1225, 1231 (7th Cir.1996).

*Kalb v. Feuerstein,* 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370 (1940), involved just the type of situation described in the Restatement's exception. *See* Restatement (Second) of Judgments § 12, note on cmt. d at 127 (citing *Kalb* ); *see also Blinder, Robinson & Co., Inc. v. S.E.C.,* 837 F.2d 1099, 1104 (D.C.Cir.1988). In

*Kalb* the appellant was a farmer who had filed a petition in the Bankruptcy Court "for composition and extension of time to pay his debts" under the Frazier–Lemke Act, Pub.L. No. 73–486, 75(s), 48 Stat. 1289 (1934) (formerly codified at 11 U.S.C. 203(s)) (repealed 1949). *Kalb,* 308 U.S. at 435–36, 60 S.Ct. 343. The Act was designed to provide relief for farmer-debtors, and it explicitly prohibited other courts from instituting or continuing foreclosure proceedings against a farmer who filed a petition under the Act in the Bankruptcy Court. *Id.* at 440–41, 60 S.Ct. 343 (quoting the Frazier–Lemke Act, 11 U.S.C. § 203(n)-(p)).[3] Nevertheless in violation of the Act's automatic stay, the Wisconsin County Court entered a mortgage foreclosure proceeding against the appellant; confirmed the sheriff's sale of his property; and ordered the appellant dispossessed. *Id.* at 436, 60 S.Ct. 343. The farmer did not directly appeal the Wisconsin County Court's decision. Instead, he instituted a separate action in the Circuit Court of Walworth County, Wisconsin for "restoration of possession." *Id.* He argued that once he filed his petition in the Bankruptcy Court, the Frazier–Lemke Act automatically stayed proceedings in the Wisconsin County Court, and the Wisconsin County Court therefore did not have jurisdiction to proceed with the foreclosure proceeding. *Id.* at 437, 60 S.Ct. 343. The Wisconsin Supreme Court rejected this argument, holding that it need not consider whether the Frazier–Lemke Act imposed an automatic stay on state court proceedings because "[n]o appeal having been taken, no showing having been made in the state court, an order of sale having been confirmed and the purchaser put in possession, the plaintiff is in no position to claim

---

**3.** A similar automatic stay provision exists in the current Bankruptcy Act. 11 U.S.C. § 362 (2000).

that the order ... is void." *Id.* at 438, 60 S.Ct. 343 (quoting language from the Wisconsin Supreme Court).

The United States Supreme Court reversed. The Court found that "considerations as to whether the issue of jurisdiction was actually contested in the County Court, or whether it could have been contested, are not applicable." *Id.* at 444, 60 S.Ct. 343. The Court detailed the history of Congress' decision to grant bankruptcy courts exclusive jurisdiction in Frazier–Lemke cases, and it concluded that, "Congress manifested its intention that the issue of jurisdiction in the foreclosing court need not be contested or even raised." *Id.* The Court held that the Wisconsin County Court's action "was not merely erroneous but was beyond its power, void, and subject to collateral attack." *Id.* at 438, 60 S.Ct. 343. The *Kalb* holding would appear to apply equally to Congress' decision to grant exclusive jurisdiction to other courts, such as the Court of Federal Claims, and thereby render void a judgment that treads upon that exclusive jurisdiction.

The Supreme Court's decision in *United States v. United States Fidelity & Guaranty Co.,* 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940), is even more closely on point. In *Fidelity & Guaranty,* a coal company was involved in a bankruptcy proceeding in the United States District Court for the Western District of Missouri, and the United States, as a trustee for the Choctaw and Chickasaw Nations ("the Nations"), filed a claim for lease royalties. *Id.* at 510, 60 S.Ct. 653. The coal company responded with a cross-claim for credits against the Nations. The Missouri district court granted the Nations' claim in part and allowed the cross-claim in full, decreeing an overall balance in favor of the coal company. *Id.* The government did not appeal this decision. However, the government had filed a separate action in the

United States District Court for the Eastern District of Oklahoma against the coal company's surety for the same royalties involved in the Missouri proceeding. *Id.* In the Supreme Court the government conceded that its claim for royalties was decided in the previous action, but it argued that the affirmative judgment on the cross-claim should not be enforced because the Missouri district court lacked jurisdiction to adjudicate a claim for affirmative relief against the Nations because of sovereign immunity, and the affirmative judgment was therefore not entitled to preclusive effect. *Id.* at 511, 60 S.Ct. 653. The Oklahoma district court and the Tenth Circuit held that the Missouri decision on the cross-claim was preclusive and that the government could not collaterally attack the judgment. *Id.* The Supreme Court reversed. The Court explained that a cross-claim against the Nations was comparable to a claim against the United States and was barred by sovereign immunity unless brought in the appropriate court, and Congress had not waived the Nations' sovereign immunity in the Missouri district court. *Id.* at 513, 60 S.Ct. 653. Accordingly, the Court held that the earlier "Missouri judgment [was] void ... [because] cross-claims against the [Indian Nations] are justiciable only in those courts where Congress has consented to their consideration," *id.* at 512, 60 S.Ct. 653, namely a "United States court in the Indian Territory," *id.* at 513, 60 S.Ct. 653 (quoting the Act of April 26, 1906, Pub.L. No. 59–129, § 18, 34 Stat. 137, 144). Finally, the Court held that the Missouri district court's judgment on the cross-claim was "subject to collateral attack" because it was "void" and was not entitled to preclusive effect. *Id.* at 514, 60 S.Ct. 653. The Court explained:

> Consent alone gives jurisdiction to adjudge against a sovereign. Absent that consent, the attempted exercise of judi-

cial power is void. The failure of officials to seek review cannot give force to this exercise of judicial power. Public policy forbids suit unless consent is given, as clearly as public policy makes jurisdiction exclusive by declaration of the legislative body.

*Id.*

In *Durfee v. Duke*, 375 U.S. 106, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963), the Supreme Court cited both *Kalb* and *Fidelity & Guaranty* for the proposition that the "doctrine[ ] of . . . sovereign immunity may in some contexts be controlling" and allow a party to collaterally attack the jurisdiction of a court, thereby overriding the res judicata effect of the court's decision. *Id.* at 114, 84 S.Ct. 242. The Seventh Circuit, in *United States v. County of Cook*, 167 F.3d 381 (7th Cir.1999), noted that *Fidelity & Guaranty* "permits the United States to ignore proceedings instituted against it in the wrong court" because such decisions are void. *Id.* at 390. Likewise, our court concluded in *International Air Response v. United States*, 324 F.3d 1376 (Fed.Cir. 2003), that *Fidelity & Guaranty* teaches to override the res judicata effect of a prior opinion when its issuing court's lack of jurisdiction "directly implicat[es] issues of sovereign immunity." *See id.* at 1380.

### III

Respect for the exclusive jurisdiction of the Court of Federal Claims is no less important than respect for the exclusive jurisdiction of the bankruptcy courts in *Kalb* or that of the Indian Territory courts in *Fidelity & Guaranty.* The history of the Court of Federal Claims' jurisdiction over suits under the Tucker Act emphasizes the importance that Congress ascribed to the exclusive nature of that jurisdiction. In 1887, Congress amended the Court of Federal Claims' jurisdiction to include "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages not sounding in tort." 28 U.S.C. § 1491 (2000). This provision has come to be known as the Tucker Act.[4] The 1887 Act also included a provision known as the Little Tucker Act that gave district courts concurrent jurisdiction with the Court of Claims over suits against the government in certain instances. 24 Stat. 505 (codified as amended at 28 U.S.C. § 1346 (2000)).[5] As the Supreme Court has held, the obvious implication of these acts is that Congress intended the Court of Federal Claims to have

> exclusive jurisdiction to render judgment upon any claim against the United States for money damages exceeding $10,000 that is founded either upon the Constitution, or any Act of Congress or

**4.** When asked to clarify the purpose of this grant of exclusive jurisdiction to the Court of Federal Claims, Congressman J.R. Tucker, the namesake of the act, explained that "[u]pon full consideration by the committee it was thought that where a claim exceeded $10,000 it would be better and safer for the Government it should be where the head of the Department may be present to protect the Government." 49 Cong. Rec. 624 (1887).

**5.** The Little Tucker Act reads as follows:

> The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of . . . [a]ny . . . civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. . . .
>
> 28 U.S.C. § 1346 (2000).

any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages, in cases not sounding in tort ... unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute.

See *Eastern Enters. v. Apfel*, 524 U.S. 498, 520, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (internal quotations omitted); *see also Clinton v. Goldsmith*, 526 U.S. 529, 539 n. 13, 119 S.Ct. 1538, 143 L.Ed.2d 720 (1999) ("Under the Tucker Act, the Court of Federal Claims has exclusive jurisdiction over nontort claims against the government for greater than $10,000.").[6]

In the light of this history, we see no basis for distinguishing the Supreme Court's decisions in *Kalb* or *Fidelity & Guaranty*. Although we are reluctant to conclude that one of our sister circuits has acted beyond its jurisdiction, we find that it plainly did so here. The Fifth Circuit's ruling, like the ones at issue in *Kalb* and *Fidelity & Guaranty*, did not merely exceed the court's jurisdiction, it "directly implicat[ed] issues of sovereign immunity" and is therefore void. *See Int'l Air Response*, 324 F.3d at 1380. Because the Fifth Circuit's judgment is void, it is not entitled to preclusive effect, despite the fact that the court's jurisdiction was not challenged on direct review. *See* Restatement (Second) of Judgments, at 13 (1982); *see also id.* at 19. We accordingly reject the appellants' argument that the Fifth Circuit's decision conclusively determined the government's liability. The Fifth Circuit's judgment is void as to the contract issues that could have been decided and also as to those contract issues actually decided.

## IV

■ We turn now to the question whether the Court of Federal Claims correctly granted summary judgment in favor of the government on the appellants' contract claim. The Court of Federal Claims correctly declined to afford res judicata effect to the Fifth Circuit's decision, but it erred in ascribing collateral estoppel effect to the contract issues decided by the Fifth Circuit. Those issues should have been decided de novo by the Court of Federal Claims. However, while we doubt the correctness of the Fifth Circuit's decision that the government breached in refusing to consider the appellants' rent increase request, we are reluctant to address the question of the government's breach on the current record. The government did not move for summary judgment on that ground. *See Christopher Vill.*, 53 Fed.Cl. at 183. Rather, the government moved for summary judgment on the ground that, even assuming a government breach in 1995, the government was not liable because the appellants committed prior material breaches in 1992, 1994, and 1995 by submitting false data to HUD in connection with Mockingbird Run. *Id.* The Court of Federal Claims, agreeing with the government, held that the MAGI Plea Agreement established that the appellants had submitted false claims for rent increases to the government "in violation of HUD regulations and specific terms of the HAP contract with [the appellants], which prohibited the submittal of, 'any false statements

---

**6.** To be sure, jurisdiction is only exclusive if the Court of Federal Claims can award full relief. The jurisdiction is not exclusive where " § 702 of the APA is construed to authorize a district court to grant monetary relief" as part of broader relief, and the "purely monetary aspects of the case could have been decided in the Claims Court." *Bowen*, 487 U.S. at 910 n. 48, 108 S.Ct. 2722. But, as discussed above, section 704 precludes district court jurisdiction in this case, and the Court of Federal Claims' jurisdiction is exclusive.

or misrepresentations to HUD in connection with HUD mortgage insurance, loan processing or administration of the contract.'" *Id.* at 186 (quoting HAP Contract (App. at 2104)).

] When "a party to a contract ... is sued for its breach [it] may ordinarily defend on the ground that there existed, at the time [of the breach], a legal excuse for nonperformance...." *Coll. Point Boat Corp. v. United States,* 267 U.S. 12, 15, 45 S.Ct. 199, 69 L.Ed. 490 (1925); *see also Sun Studs, Inc. v. ATA Equip. Leasing, Inc.,* 872 F.2d 978, 992–93 (Fed.Cir.1989). In resolving disputes among parties who each claim that the other has breached, courts will "[o]ften ... impose liability on the party that committed the *first material breach.*" E. Allen Farnsworth, *Farnsworth on Contracts* § 8.15, at 439 (1990) (emphasis in original). The Restatement explains that this doctrine of first material breach, or prior material breach, is "based on the principle that where performances are to be exchanged under an exchange of promises, each party is entitled to the assurance that he will not be called upon to perform his remaining duties ... if there has already been an uncured material failure of performance by the other party." Restatement (Second) of Contracts § 237b, cmt. b (1981). A later breach "is justified ... by the other party's [prior] failure." *Id.; see also Sun Studs,* 872 F.2d at 992 (citing this provision of the Restatement in a discussion of the doctrine of prior material breach).

 The appellants urge that MAGI's Plea Agreement cannot establish a prior material breach by the appellants because neither Christopher Village nor its general partner Wilshire was a party to the Plea Agreement; because the government has not established that the appellants intend-

ed to defraud HUD when they submitted inflated rent requests; because any breach that the appellants may have committed through these false submissions was immaterial; and because, even if these false submissions constituted a material breach by the appellants, the government was unaware of them at the time HUD breached.

We think that the documentation submitted by the government on its motion for summary judgment did not support the Court of Federal Claims' finding "that Wilshire Investments, the general partner in the Christopher Village Limited Partnership, was part of the [MAGI] fraud." *Christopher Vill.,* 53 Fed.Cl. at 187 n. 4. Nonetheless, although it is true that the Plea Agreement did not directly implicate Christopher Village or Wilshire in the fraud, the existence of the false statements concerning Mockingbird Run is undisputed. On summary judgment the appellants conceded that false data concerning insurance premiums were submitted to the government in connection with the Mockingbird Run rent increase requests, and that these requests caused the government to make unjustified payments to the appellants. *Id.* at 189 ("The plaintiffs do not dispute that they submitted false certifications in support of their rent increase requests and that plaintiffs used HUD funds to pay for, at least in part, illegally-inflated insurance costs."). The appellants reiterated this concession at oral argument in our court. It is also clear that the appellants violated both the Regulatory Agreement and the HAP Contract by submitting these inflated rent increase requests, contrary to contract provisions that prohibited the submission of "false statements or misrepresentations to HUD in connection with HUD mortgage insurance," HAP Contract ¶ 26 (App. at 2404).[7]

7. The Court of Federal Claims also properly held:

While the government has not established that Christopher Village and Wilshire specifically intended to defraud HUD, proof of fraudulent intent by Wilshire or Christopher Village is not necessary to establish the appellants' breach in this case. The appellants' contrary contentions are based on a fundamental misunderstanding of the government's prior material breach defense. The appellants claim that the plaintiff's intent to defraud must be proven under 28 U.S.C. § 2514, a statute providing that a plaintiff's fraud can cause a forfeiture of its claim against the government.[8] This statute, however, is not the basis for the government's argument, and the government never mentioned the statute in its brief. The Court of Federal Claims did not hold, and the government did not urge, that the appellants' inflated rent requests caused the appellants to forfeit their breach of contract claim against the government. Rather, the question is whether as a matter of contract law the government can defend against a subsequent breach by pointing to the appellants' prior breach.

The contract law question is whether the appellants' established and uncontroverted breach was sufficiently material so as to justify the government's subsequent

breach. The appellants correctly cite our decision in *Thomas v. Department of Housing & Urban Development*, 124 F.3d 1439, 1442 (Fed.Cir.1997), for the proposition that "[o]nly material breaches can justify the government's rescinding a contract." (Appellants' Br. at 46.) The appellants reason that their false submissions concerned an amount of money that was too small to be material.[9] We disagree with the appellants' conclusion that their breach was not material.

At the outset, we note that our case law holds that any degree of fraud is material as a matter of law. *Joseph Morton Co., Inc. v. United States*, 757 F.2d 1273, 1278 (Fed.Cir.1985). This is particularly true in light of Congress' express prohibition of kickbacks reflected in the Anti-Kickback Act of 1986, 41 U.S.C. §§ 51–58 (2000). *See United States v. Acme Process Equip. Co.*, 385 U.S. 138, 144–45, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966). Our court, in turn, has "underscore[d] the necessity for the Government to be secure in its confidence in its contractors." *Joseph Morton*, 757 F.2d at 1278.

 Although the appellants may not themselves have participated in the fraud

The undisputed facts establish that [the appellants] violated the following Regulatory Agreement provisions: (1) the prohibition on disbursement of project funds for anything other than "reasonable operating expenses and necessary repairs"; and (2) the requirement that "payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies or materials in the area where the services are rendered." In addition, these illegally-inflated insurance charges violated the [appellants'] HAP contract, which required justifications of the reasonableness ... of those expenses.

*Christopher Vill.*, 53 Fed.Cl. at 189.

8. The statute reads:

A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514 (2000).

9. The appellants contend that MAGI's illegal scheme cost Christopher Village, and in turn HUD, "roughly $1,500 per year." (Appellants' Br. at 47.) The government, however, challenges this, arguing that the appellants cite "no evidence" for the $1,500 figure. (Br. of Def.-Appellee at 42).

on HUD, their false submissions were unarguably a function of MAGI's fraud, and MAGI and the appellants were commonly controlled. It was uncontested at summary judgment in the Court of Federal Claims that MAGI and Wilshire had the same president, the same sole director, and the same sole shareholder. (Defendant's Supplemental Proposed Findings of Fact, *Christopher Vill., L.P. v. United States,* No. 99–775C (Fed.Cl.) (citing, among other things, the appellants' 1992, 1993, and 1995 rent increase requests, which listed MAGI as a limited partner of Christopher Village).) We think that the submission of false data generated by companies under common control with the contractor constitutes a material breach as a matter of law at least when the commonly controlled company generated those data in a conscious effort to defraud the government.

Case law regarding the materiality requirement under the False Statements Act, 18 U.S.C. § 1001 (2000), is instructive in this respect. This Act imposes a criminal penalty on "whoever ... knowingly or willfully ... makes any materially false, fictitious or fraudulent statements or representations" to a government agency. *Id.* Courts are generally in agreement that the Act only imposes liability for material misstatements, and that "[t]he test of the materiality of a statement is whether a statement has a natural tendency to influence, or was capable of influencing, the decision of the tribunal in making a determination required to be made." *United States v. DiFonzo,* 603 F.2d 1260, 1266 (7th Cir. 1979), *cert. denied,* 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980) (internal quotation marks omitted); *United States v. Krause,* 507 F.2d 113, 118 (5th Cir.1975); *United States v. Deep,* 497 F.2d 1316, 1321 (9th Cir.1974) (explaining that the materiality test asks whether the false statement "could affect or influence the exercise of

governmental functions,—does it have a natural tendency to influence or is it capable of influencing agency decision" (citing *United States v. East,* 416 F.2d 351, 353 (9th Cir.1969)); *Blake v. United States,* 323 F.2d 245, 246 (8th Cir.1963); *Gonzales v. United States,* 286 F.2d 118, 122 (10th Cir.1960)). This authority suggests that efforts to defraud the government that are or may be successful are particularly culpable. Here, the appellants submission of inflated insurance costs directly influenced HUD in making a determination [it was] required to ... ma[ke], *see DiFonzo,* 603 F.2d at 1266. The whole purpose of these submissions was to influence HUDs determination on the appellants rent increase requests. For example, when the appellants submitted their final rent increase request in 1995, their accompanying letter stated that [t]he reasons for the proposed rent increase are as follows ... Increase in salaries, by adding the position of a service coordinator, and *property insurance,* and utility rates. (App. at 2801) (emphasis added). The false statements were successful in securing rent increases. Thus, the appellants committed a material breach as a matter of law by submitting false data that was generated by MAGI, a company under common control, in a successful effort to defraud the government. This breach of contract was plainly material.

The appellants also contend that the MAGI illegal kickback scheme cannot form the basis of a prior material breach by the appellants because the government was unaware of this scheme at the time of HUD's alleged breach. Our precedent, however, clearly supports the Court of Federal Claims' finding that the appellants' prior breach excused HUD's subsequent breach "even though the U.S. government was not aware of the facts at the time of the foreclosure at issue in this

litigation." *Christopher Vill.*, 53 Fed.Cl. at 189. For example, in *Joseph Morton* the question was whether the contractor was properly terminated for default based on information later discovered by the government. *See* 757 F.2d at 1275. A few years after the default termination, the contractor was convicted of conspiring to defraud the government by submitting false cost statements under the contract, related to a period before the default termination. *Id.* We held that the interceding events justified the default termination because "[i]t is settled law that a party can justify a termination if there existed at the time an adequate cause, even if then unknown." *Id.* at 1277 (quoting *Pots Unlimited, Ltd. v. United States,* 220 Ct.Cl. 405, 600 F.2d 790, 793 (1979)); *see also Kelso v. Kirk Bros. Mech. Contractors, Inc.,* 16 F.3d 1173, 1175 (Fed.Cir.1994) ("This court sustains a default termination if justified by circumstances at the time of termination, regardless of whether the Government originally removed the contractor for another reason.").

V

Finally, the appellants argue that even assuming that the MAGI illegal kickback scheme constituted a material breach on their part, two other agreements that were part of the MAGI settlement prohibit the government from relying on that breach as a defense in the present litigation. While Wilshire was not a party to the Plea Agreement, it was a party to the Administrative Agreement and the Consent Judgment, executed at the same time. In support of this contention, the appellants urge that both agreements bar the government's defense. The appellants point to the provision of the Administrative Agreement that states, "HUD will not seek civil money penalties ... for any conduct alleged as the basis for liability in the civil or criminal action, for the financial defaults resulting in the foreclosure of HUD properties prior to the date of this Agreement." (App. at 253.) The appellants also highlight the provision of the Consent Judgment that states that the Government agreed to "release All Defendants from any administrative monetary or civil monetary claim that the United States or HUD has or may have under ... any ... statute[s] or common law theories creating causes of action for civil damages or civil penalties for submitting or causing to be submitted claims to the government, for the Covered Conduct." (App. at 234–35.) We disagree. The Court of Federal Claims properly held:

> [W]hile the United States agreed to forego taking any further *affirmative* enforcement actions—to either seek further penalties or to continue to press affirmative suits—against Wilshire, the Global Settlement says nothing regarding the government's ability to *defend* itself from claims levied by parties involved in the action.

*Christopher Vill.*, 53 Fed.Cl. at 191 (emphasis in original).

We conclude that the Court of Federal Claims correctly decided that the appellants engaged in a material breach of the Regulatory Agreement and the HAP Contract prior to HUD's assumed breach. We also agree that the Court of Federal Claims correctly decided that this breach barred the appellants from recovering on the government's breach of contract.

VI

Finally, there is the question whether the Court of Federal Claims properly denied class certification. As we held in *Greenbrier v. United States,* 193 F.3d 1348 (Fed.Cir.1999), the appellants' class certification "issue is moot in light of our holdings that the government is not liable to

the [appellants] for breach of contract."
*Id.* at 1360; *see also Gollehon Farming v.
United States,* 207 F.3d 1373, 1382 (Fed.
Cir.2000).

### CONCLUSION

For the foregoing reasons we affirm the
Court of Federal Claims' grant of sum-
mary judgment in favor of the govern-
ment.

*AFFIRMED.*

COSTS

No costs.